# UNITED STATES *v.* GENERAL ELECTRIC COMPANY ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

No. 113. Argued October 13, 1926.—Decided November 23, 1926.

1. Through a system of contracts between a company, which owned the patents for electric lamps with tungsten filaments and manufactured most of those sold, and a large number of wholesale and retail dealers in electrical supplies, the dealers were appointed agents of the company to sell, on commission, the lamps, which were to be consigned to them by the company, transportation prepaid; the sales were to be at prices fixed by the company; the dealers to pay all expenses except the original transportation, and to account to the company periodically for the amount, less commission, of all sales, cash or credit; and all the stock entrusted to the dealers was to remain the property of the company until sold, and to be accounted for by the dealers.

*Held,* that the dealers were genuine agents, not purchasers in disguise; and that the plan was not a device to fix prices after sale and to restrain trade and exercise monopoly in the lamps, in violation of the Anti-Trust Act. P. 484.

2. The circumstance that the agents were in their regular business merchants and under a prior arrangement had bought the lamps and sold them as their own, did not prevent this change in their relation to the company. P. 484.

3. Nor did the size and comprehensiveness of the scheme bring it within the Anti-Trust Law. P. 485.

4. As a patentee has a statutory monopoly of the right to make, use, and sell the patented articles, the comprehensiveness of his control of the business of selling is not necessarily an evidence of illegality in method. P. 485.

5. As long as a patentee makes no effort to fasten upon ownership of the articles he sells control of the prices at which his purchaser shall sell, it makes no difference how widespread his monopoly. P. 485.

6. The owner of articles, patented or otherwise, is not violating the common law or the Anti-Trust law by seeking to dispose of his articles directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer. P. 488.

7. A patentee, in licensing another person to make, use, and vend, may lawfully impose the condition that sales by the licensee shall be at prices fixed by the licensor and subject to change at his discretion. P. 488.

15 F. (2d) 715, affirmed.

APPEAL from a decree of the District Court dismissing, for want of equity, a bill brought by the United States to enjoin the General Electric Company, Westinghouse Electric and Manufacturing Company, and Westinghouse Lamp Company, appellees herein, from prosecuting a plan for the distribution and sale of patented electric lamps, which was alleged to be a restraint and monopoly of interstate commerce.

*Mr. James A. Fowler,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell, Assistant*

to the *Attorney General Donovan,* and *Mr. Abram F. Myers,* Special Assistant to the Attorney General, were on the brief, for the United States.

*Mr. Charles Neave,* with whom *Messrs. Frederick P. Fish, Newton D. Baker, Charles W. Appleton,* and *Howard A. Couse* were on the brief, for the General Electric Company.

*Mr. Frederick H. Wood,* with whom *Messrs. Paul D. Cravath, F. Harold Smith,* and *Donald C. Swatland* were on the brief, for the Westinghouse Electric & Manufacturing Company.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a bill in equity brought by the United States in the District Court for the Northern District of Ohio to enjoin the General Electric Company, the Westinghouse Electric and Manufacturing Company, and the Westinghouse Lamp Company from further violation of the Anti-Trust Act of July 2, 1890. 26 Stat. 209, c. 647. The bill made two charges, one that the General Electric Company in its business of making and selling incandescent electric lights had devised and was carrying out a plan for their distribution throughout the United States by a number of so-called agents, exceeding 21,000, to restrain interstate trade in such lamps and to exercise a monopoly of the sale thereof; and, second, that it was achieving the same illegal purpose through a contract of license with the defendants, the Westinghouse Electric and Manufacturing Company and the Westinghouse Lamp Company. As the Westinghouse Lamp Company is a corporation all of whose stock is owned by the Westinghouse Electric and Manufacturing Company, and is but its selling agent, we may treat the two as one, and reference hereafter will be only to the defendants the General Elec-

tric Company, which we shall call the Electric Company, and the Westinghouse Company.

The Government alleged that the system of distribution adopted was merely a device to enable the Electric Company to fix the resale prices of lamps in the hands of purchasers; that the so-called agents were in fact wholesale and retail merchants, and the lamps passed through the ordinary channels of commerce in the ordinary way, and that the restraint was the same and just as unlawful as if the so-called agents were avowed purchasers handling the lamps under resale price agreements. The Electric Company answered that its distributors were *bona fide* agents, that it had the legal right to market its lamps and pass them directly to the consumer by such agents, and at prices and by a system prescribed by it and agreed upon between it and its agents, there being no limitation sought as to resale prices upon those who purchased from such agents.

The second question in the case involves the validity of a license granted March 1, 1912, by the Electric Company to the Westinghouse Company to make, use and sell lamps under the patents owned by the former. It was charged that the license in effect provided that the Westinghouse Company would follow prices and terms of sales from time to time fixed by the Electric Company and observed by it, and that the Westinghouse Company would, with regard to lamps manufactured by it under the license, adopt and maintain the same conditions of sale as observed by the Electric Company in the distribution of lamps manufactured by it.

The District Court upon a full hearing dismissed the bill for want of equity and this is an appeal under § 2 of the Act of February 11, 1903, known as the Expediting Act. 32 Stat. 823, c. 544, § 2.

There had been a prior litigation between the United States and the three defendants and thirty-two other cor-

porations, in which the Government sued to dissolve an illegal combination in restraint of interstate commerce in electric lamps, in violation of the Anti-Trust Act, and to enjoin further violation. A consent decree was entered in that cause by which the combination was dissolved, the subsidiary corporations surrendered their charters, and their properties were taken over by the General Electric Company. The defendants were all enjoined from fixing resale prices for purchasers, except that the owner of the patents was permitted to fix the prices at which a licensee should sell lamps manufactured by it under the patent. After the decree was entered, a new sales plan, which was the one here complained of, was submitted to the Attorney General. The Attorney General declined to express an opinion as to its legality. The plan was adopted and has been in operation since 1912.

The Government insists that these circumstances tend to support the Government's view that the new plan was a mere evasion of the restrictions of the decree and was intended to carry out the same evil result that had been condemned in the prior litigation. There is really no conflict of testimony, in the sense of a variation as to the facts, but only a difference as to the inference to be drawn therefrom. The evidence is all included in a stipulation as to certain facts, as to what certain witnesses for the defendants would testify, and as to the written contracts of license and agency made by the Electric Company and the Westinghouse Company.

The Electric Company is the owner of three patents— one of 1912 to Just & Hanaman, the basic patent for the use of Tungsten filaments in the manufacture of electric lamps; the Coolidge patent of 1913, covering a process of manufacturing tungsten filaments by which their tensile strength and endurance are greatly increased; and, third, the Langmuir patent of 1916, which is for the use of gas in the bulb by which the intensity of the

light is substantially heightened.  These three patents cover completely the making of the modern electric lights with the tungsten filaments, and secure to the Electric Company the monopoly of their making, using and vending.

The total business in electric lights for the year 1921 was $68,300,000, and the relative percentages of business done by the companies were, Electric 69 per cent., Westinghouse, 16 per cent., other licensees, 8 per cent., and manufacturers not licensed, 7 per cent.  The plan of distribution by the Electric Company divides the trade into three classes.  The first class is that of sales to large consumers readily reached by the Electric Company, negotiated by its own salaried employees and the deliveries made from its own factories and warehouses.  The second class is of sales to large consumers under contracts with the Electric Company, negotiated by agents, the deliveries being made from stock in the custody of the agents; and the third is of the sales to general consumers by agents under similar contracts.  The agents under the second class are called B agents, and the agents under the third class are called A agents.  Each B agent is appointed by the Electric Company by the execution and delivery of a contract for the appointment, which lasts a year from a stated date, unless sooner terminated.  It provides that the company is to maintain on consignment in the custody of the agent a stock of lamps, the sizes, types, classes and quantity of which, and the length of time which they are to remain in stock, to be determined by the company.  The lamps consigned to the agents are to be kept in their respective places of business where they may be readily inspected and identified by the company.  The consigned stock or any part of it is to be returned to the company as it may direct.  The agent is to keep account books and records giving the complete information as to his dealings for the inspec-

23468°—27——31.

tion of the company. All of the lamps in such consigned stock are to be and remain the property of the company until the lamps are sold, and the proceeds of all lamps are to be held in trust for the benefit and for the account of the company until fully accounted for. The B agent is authorized to deal with the lamps on consignment with him in three ways—first to distribute the lamps to the company's A agents as authorized by the company; second, to sell lamps from the stock to any consumer to the extent of his requirements for immediate delivery at prices specified by the company; third, to deliver lamps from the stock to any purchaser under written contract with the company to whom the B agent may be authorized by the company to deliver lamps at the prices and on the terms stated in the contract. The B agent has no authority to dispose of any of the lamps except as above provided and is not to control or attempt to control prices at which any purchaser shall sell any of such lamps. The agent is to pay all expenses in the storage, cartage, transportation, handling, sale and distribution of lamps, and all expenses incident thereto and to the accounting therefor and to the collection of accounts created. This transportation does not include the freight for the lamps in the consignment from the company to the agent. The agent guarantees the return to the company of all unsold lamps in the custody of the agent within a certain time after the termination of his agency. The agent is to pay over to the company, not later than the 15th of each month, an amount equal to the total sales value, less the agent's compensation, of all of the company's lamps sold by him,—that is, first, of the collections that have been made, second of those customers' accounts which are past due. This is to comply with the guaranty of the agent of due and prompt payment for all lamps sold by him from his stock. Third, the agent is to pay to the company the value of all of the company's

lamps lost or missing from or damaged in the stock in his custody. There is a basic rate of commission payable to the agent, and there are certain special supplemental and additional compensations for prompt and efficient service. If the agent becomes insolvent, or fails to make reports and remittances, or fails in any of his obligations, the appointment may be terminated; and, when terminated, either at the end of the year or otherwise, the consigned lamps remaining unsold are to be delivered to the manufacturer. It appears in the evidence that since 1915, although there is no specific agreement to this effect, the company has assumed all risk of fire, flood, obsolescence, and price decline, and carries whatever insurance is carried on the stocks of lamps in the hands of its agents, and pays whatever taxes are assessed. This is relevant as a circumstance to confirm the view that the so-called relation of agent to the company is the real one. There are 400 of the B agents, the large distributors. They recommend to the company efficient and reliable distributors, in the localities with which they are respectively familiar, to act as A agents whom the company appoints. There are 21,000 or more of the A agents. They are usually retail electrical supply dealers in smaller places. The only sales which the A agent is authorized to make are to consumers for immediate delivery and to purchasers under written contract with the manufacturer, just as in the case of the B agents. The plan was of course devised for the purpose of enabling the company to deal directly with consumers and purchasers, and doubtless was intended to avoid selling the lamps owned by the company to jobbers or dealers, and prevent sale by these middle men to consumers at different and competing prices. The question is whether, in view of the arrangements, made by the company with those who ordinarily and usually would be merchants buying from the manufacturer and selling to the public,—such persons

are to be treated as agents, or as owners of the lamps consigned to them under such contracts. If they are to be regarded really as purchasers, then the restriction as to the prices at which the sales are to be made is a restraint of trade and a violation of the Anti-Trust law.

. We find nothing in the form of the contracts and the practice under them which makes the so-called B and A agents anything more than genuine agents of the company, or the delivery of the stock to each agent anything more than a consignment to the agent for his custody and sale as such. He is not obliged to pay over money for the stock held by him until it is sold. As he guarantees the account when made, he must turn over what should have been paid whether he gets it or not. This term occurs in a frequent form of pure agency known as sale by *del credere* commission. There is no conflict in the agent's obligation to account for all lamps lost, missing or damaged in the stock. It is only a reasonable provision to secure his careful handling of the goods entrusted to him. We find nothing in his agreement to pay the expense of storage, cartage, transportation (except the freight on the original consignment), handling and the sale and distribution of the lamps, inconsistent with his relation as agent. The expense of this is of course covered in the amount of his fixed commission. The agent has no power to deal with the lamps in any way inconsistent with the ownership of the lamps retained by the company. When they are delivered by him to the purchasers, the title passes directly from the company to those purchasers. There is no evidence that any purchaser from the company, or any of its agents, is put under any obligation to sell at any price or to deal with the lamps purchased except as an independent owner. The circumstance that the agents were in their regular business wholesale or retail merchants, and under a prior arrangement had bought the lamps, and sold them as

their owners, did not prevent a change in their relation to the company. We find no reason in this record to hold that the change in this case was not in good faith and actually maintained.

But it is said that the system of distribution is so complicated and involves such a very large number of agents distributed throughout the entire country, that the very size and comprehensiveness of the scheme brings it within the Anti-Trust law. We do not question that in a suit under the Anti-Trust Act the circumstance that the combination effected secures domination of so large a part of the business affected as to control prices is usually most important in proof of a monopoly violating the Act. But under the patent law the patentee is given by statute a monopoly of making, using and selling the patented article. The extent of his monopoly in the articles sold and in the territory of the United States where sold is not limited in the grant of his patent, and the comprehensiveness of his control of the business in the sale of the patented article is not necessarily an indication of illegality of his method. As long as he makes no effort to fasten upon ownership of the articles he sells control of the prices at which his purchaser shall sell, it makes no difference how widespread his monopoly. It is only when he adopts a combination with others, by which he steps out of the scope of his patent rights and seeks to control and restrain those to whom he has sold his patented articles in their subsequent disposition of what is theirs, that he comes within the operation of the Anti-Trust Act. The validity of the Electric Company's scheme of distribution of its electric lamps turns, therefore, on the question whether the sales are by the company through its agents to the consumer, or are in fact by the company to the so-called agents at the time of consignment. The distinction in law and fact between an agency and a sale is clear. For the reasons already stated, we find no

ground for inference that the contracts made between the company and its agents are, or were intended to be, other than what their language makes them.

The Government relies in its contention for a different conclusion on the case of *Dr. Miles Medical Company* v. *John D. Park & Sons Company;* 220 U. S. 373. That case was a bill in equity brought by the Miles Medical Company to enjoin Park & Sons Company from continuing an alleged conspiracy with a number of wholesale and retail dealers in proprietary medicines, to induce the persons who had entered into certain agency contracts, to the number of 21,000 through the country, to break their contracts of agency with the Medical Company, to the great injury of that company. The agency concerned the sale of proprietary medicines prepared by secret methods and formulas and identified by distinctive packages and trademarks. The company had an extensive trade throughout the United States and certain foreign countries. It had been its practice to sell its medicines to jobbers and wholesale druggists, who in turn sold to retail druggists for sale to the customer. It had fixed not only the price of its own sales to jobbers and wholesale dealers but also the prices of jobbers and small dealers. The defendants had inaugurated a cut-rate or cut-price system which had caused great damage to the complainant's business, injuriously affected its reputation and depleted the sales of its remedies. The bill was demurred to, on the ground that the methods set forth in the bill, by which attempt was made to control the sales or prices to consumers, was illegal both at common law and under the Anti-Trust Act, and deprived the bill of any equity. This was the issue considered by the Court.

The plan of distribution of the Miles Medical Company resembled in many details the plan of distribution in the present case, except that the subject matter there was medicine by a secret formula, and not a patented article.

But there were certain vital differences. These led the Circuit Court of Appeals (164 Fed. 803) to declare that the language of the so-called contracts of agency was false in its purport, and merely used to conceal what were really sales to the so-called agents. This conclusion was sustained by certain allegations in the bill inconsistent with the contracts of agency, to the effect that the Medical Company did sell to these so-called agents the medical packages consigned. This Court, however, without reference to these telltale allegations of the bill, found in the contracts themselves and their operation plain provision for purchases by the so-called agents, which necessarily made the contracts, as to an indefinite amount of the consignments to them, contracts of sale rather than of agency. The Court therefore held that the showing made was of an attempt by the Miles Medical Company, through its plan of distribution, to hold its purchasers, after the purchase at full price, to an obligation to maintain prices on a resale by them. This is the whole effect of the *Miles Medical* case. That such it was is made plain in the case of *Boston Store* v. *American Graphophone Company,* 246 U. S. 8, 21, in which then Chief Justice White reviewed the various cases on this general subject and spoke of the *Miles Medical* case as follows:

"In *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S., 373, it was decided that under the general law the owner of movables (in that case, proprietary medicines compounded by a secret formula) could not sell the movables and lawfully by contract fix a price at which the product should afterwards be sold, because to do so would be at one and the same time to sell and retain, to part with and yet to hold, to project the will of the seller so as to cause it to control the movable parted with when it was not subject to his will because owned by another, and thus to make the will of the seller unwarrantedly take the place of the law of the land as to such movables.

It was decided that the power to make the limitation as to price for the future could not be exerted consistently with the prohibitions against restraint of trade and monopoly contained in the Anti-Trust Law."

Nor does the case of the *Standard Sanitary Manufacturing Company* v. *United States,* 226 U. S. 20, sustain the contention of the Government on the first question. There a number of manufacturers, one of whom owned a patent for enameled iron ware for plumbing fixtures, made a combination to accept licenses to make the patented commodities and to sell them in interstate trade to jobbers, and to refuse to sell to jobbers who would not agree to maintain fixed prices in sales to plumbers. This was an attempt just like that in the *Miles Medical Company* case, to control the trade in the articles sold and fasten upon purchasers, who had bought at full price and were complete owners, an obligation to maintain resale prices.

We are of opinion, therefore, that there is nothing as a matter of principle, or in the authorities, which requires us to hold that genuine contracts of agency like those before us, however comprehensive as a mass or whole in their effect, are violations of the Anti-Trust Act. The owner of an article, patented or otherwise, is not violating the common law, or the Anti-Trust law, by seeking to dispose of his article directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer. The first charge in the bill can not be sustained.

*Second.* Had the Electric Company, as the owner of the patents entirely controlling the manufacture, use and sale of the tungsten incandescent lamps, in its license to the Westinghouse Company, the right to impose the condition that its sales should be at prices fixed by the licensor and subject to change according to its discretion? The contention is also made that the license required the Westinghouse Company not only to conform in the matter

of the prices at which it might vend the patented articles, but also to follow the same plan as that which we have already explained the Electric Company adopted in its distribution. It does not appear that this provision was express in the license, because no such plan was set out therein; but even if the construction urged by the Government is correct, we think the result must be the same.

The owner of a patent may assign it to another and convey, (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and through a specific part of the United States. But any assignment or transfer short of one of these is a license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement. *Waterman* v. *Mackenzie,* 138 U. S. 252, 255; *Gayler* v. *Wilder,* 10 How. 477, 494, 495; *Moore* v. *Marsh,* 7 Wall. 515, and *Crown Company* v. *Nye Tool Works,* 261 U. S. 24, 30. Conveying less than title to the patent, or part of it, the patentee may grant a license to make, use and vend articles under the specifications of his patent for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure. It is well settled, as already said, that where a patentee makes the patented article and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. *Adams* v. *Burke,* 17 Wall. 453; *Bloomer* v. *McQuewan,* 14 How. 539; *Mitchell* v. *Hawley,* 16 Wall. 544; *Hobbie* v. *Jennison,* 149 U. S. 355; *Keeler* v. *Standard Folding Bed Co.,* 157 U. S. 659. But the question is a different one which arises when we consider what a patentee who grants a license to one to make and vend the patented article may do in limiting the licensee in the

exercise of the right to sell. The patentee may make and grant a license to another to make and use the patented articles, but withhold his right to sell them. The licensee in such a case acquires an interest in the articles made. He owns the material of them and may use them. But if he sells them, he infringes the right of the patentee, and may be held for damages and enjoined. If the patentee goes further, and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so, provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend, and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, " Yes, you may make and sell articles under my patent, but not so as to destroy the profit that I wish to obtain by making them and selling them myself." He does not thereby sell outright to the licensee the articles the latter may make and sell, or vest absolute ownership in them. He restricts the property and interest the licensee has in the goods he makes and proposes to sell.

This question was considered by this Court in the case of Bement v. National Harrow Company, 186 U. S. 70. A combination of manufacturers owning a patent to make float spring tool harrows, licensed others to make and sell the products under the patent, on condition that they would not during the continuance of the license sell the products at a less price, or on more favorable terms of payment and delivery to purchasers, than were set forth

in a schedule made part of the license. That was held to be a valid use of the patent rights of the owners of the patent. It was objected that this made for a monopoly. The Court, speaking by Mr. Justice Peckham, said (p. 91):

"The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal."

Speaking of the contract, he said (p. 93):

"The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article."

The question which the Court had before it in that case came to it on a writ of error to the Court of Appeals of New York, and raised the federal issue whether a contract of license of this kind, having a wide operation in the sales of the harrows, was invalid because a violation of the Anti-Trust law. This Court held that it was not.

It is argued, however, that *Bement* v. *National Harrow Company* has been in effect overruled. The claim is based on the fact that one of the cases cited by Mr. Justice Peckham in that case was *Heaton-Peninsula Button-Fastener Company* v. *Eureka Specialty Company,* 77 Fed.

288. This was a decision by the Circuit Court of Appeals of the Sixth Circuit, the opinion being written by Circuit Judge Lurton, afterwards a Justice of this Court. The question there considered was whether the owner of a patent for a machine for fastening buttons to shoes with metallic fasteners might sell such machines subject to the condition that they should be used only with fasteners manufactured by the seller, the patented machine to revert on the breach of the condition. The purchaser of the machine was held to be a licensee and the use by him of the unpatented fasteners contrary to the condition to be a breach of contract of the license and an infringement of the patent monopoly.

A similar case came before this Court and is reported in *Henry* v. *Dick Company,* 224 U. S. 1, the opinion in which was also delivered by Mr. Justice Lurton. In that case, a complainant sold his patented machine embodying his invention. It was called the "Rotary Mimeograph." The claims of the patent did not embrace ink or other materials used in working it. Upon the machine, however, was inscribed a notice, styled a License Restriction, reciting that the machine might be used only with the stencil paper, ink and other supplies made by the A. B. Dick Company. The Henry Company, dealers in ink, sold to the purchaser, for use in working her machine, ink not made by the Dick Company. This Court held by a majority that the use of such ink by the purchaser was a prohibited use and rendered her liable to an action under the patent law for infringement, and that the seller of the ink was liable as a contributory infringer.

The case was overruled by this Court in the *Motion Picture Patents Company* v. *Universal Film Company,* 243 U. S. 502. The patent in that case covered a part of the mechanism used in motion picture exhibiting machines for feeding a film through the machine with a regular, uniform and accurate movement, so as not to expose

the film to excessive strain or wear. The license agree-ment contained a covenant on the part of the licensee, that every machine sold by it should be sold under the restriction and condition that such exhibiting or project-ing machines should be used solely for exhibiting or pro-jecting motion pictures of the Motion Picture Patents Company. The overruling of the *Dick* case was based on the ground that the grant of the patent was of the exclusive right to use the mechanism and produce the result with any appropriate material, and that the mate-rials or pictures upon which the machine was operated were no part of the patented machine, or of the combina-tion which produced the patented result.

The overruling of the *Dick* case and the disapproval of the *Button-Fastener* case by the *Motion Picture Film* case did not carry with it the overruling of *Bement* v. *Harrow Company*. The *Button-Fastener* case was cited in the case of *Bement* v. *Harrow Company* to sustain the decision there by what was an *a fortiori* argument. The ruling in the former case was much broader than was needed for the decision in the latter. The price at which a patented article sells is certainly a circumstance having a more direct relation, and is more germane to the rights of the patentee, than the unpatented material with which the patented article may be used. Indeed, as already said, price fixing is usually the essence of that which secures proper reward to the patentee.

Nor do we think that the decisions of this Court hold-ing restrictions as to price of patented articles invalid, apply to a contract of license like the one in this case. Those cases are: *Boston Store* v. *American Graphophone Company*, 246 U. S. 8; *Straus* v. *Victor Talking Machine Company*, 243 U. S. 490; *Bauer* v. *O'Donnell*, 229 U. S. 1; *Standard Sanitary Manufacturing Company* v. *United States*, 226 U. S. 20; *Bobbs-Merrill Company* v. *Straus*, 210 U. S. 339. These cases really are only instances of

the application of the principle of *Adams* v. *Burke,* 17 Wall. 453, 456, already referred to, that a patentee may not attach to the article made by him, or with his consent, a condition running with the article in the hands of purchasers, limiting the price at which one who becomes its owner for full consideration shall part with it. They do not consider or condemn a restriction put by a patentee upon his licensee as to the prices at which the latter shall sell articles which he makes and only can make legally under the license. The authority of *Bement* v. *Harrow Company* has not been shaken by the cases we have reviewed.

For the reasons given, we sustain the validity of the license granted by the Electric Company to the Westinghouse Company. The decree of the District Court dismissing the bill is

*Affirmed.*