In the Matter of the Proceeding of INTERBOROUGH NEWS COMPANY, Petitioner, against JOSEPH D. McGOLDRICK, as Comptroller of the City of New York, and ALMERINDO PORTFOLIO, as Treasurer of the City of New York, Respondents, to Review a Determination of JOSEPH D. McGOLDRICK, as Comptroller of the City of New York.

First Department, November 17, 1939.

*Archie O. Dawson* of counsel [*John D. Mooney* with him on the brief; *Hines, Rearick, Dorr & Hammond,* attorneys], for the petitioner.

*Milton Sandberg* of counsel [*Arthur A. Segall* and *Sol Charles Levine* with him on the brief; *William C. Chanler, Corporation Counsel,* attorney], for the respondents.

TOWNLEY, J. This is a proceeding to review a determination of the comptroller of the city of New York which held that the Interborough News Company owed the city of New York as gross receipts taxes for the years 1933 to 1936, inclusive, $6,354.71. The issue is whether the taxpayer when acting as a distributor of magazines in the city of New York is the agent of the publishers or is a purchaser from the publishers. The taxpayer has conceded that, to the extent

that it sells magazines at retail to the public, it is a purchaser and is liable for the tax amounting to $1,375.84. The dispute arose as to the interpretation of the taxpayer's contracts with magazine publishers in so far as the taxpayer's duty is to deliver the magazines to other retailers in the city for public sale and collect the proceeds. The taxpayer has written contracts with Frank A. Munsey Company, International Circulation Company, Curtis Publishing Company, Kable News Company, Independent News Co., Butterick Publishing Co., Midwest Distributors, Inc., and Macfadden Publications, Inc. As far as the contract with Macfadden Publications, Inc., is concerned, the city admits that under that contract the taxpayer is an agent only and not a purchaser.

An examination of the contracts shows the following descriptions of the relationship of the parties: In the Munsey contract, the publisher calls the taxpayer " its agent for the sale at wholesale and retail of the magazines and periodicals above mentioned." In the International Circulation contract, it is said that the " Company hereby appoints Distributor its agent for the wholesale distribution of Screenland and Silver Screen magazines," and in the Curtis Publishing Company contract, the publisher covenants and agrees to appoint the Interborough News Company as " District Agent for the Saturday Evening Post, The Ladies' Home Journal and the Country Gentleman." Under the Kable News Company agreement, the taxpayer agrees to " draw a sufficient supply of your magazines to fill the requirements of those newsdealers operating in Greater New York " as " the sole distributor of your magazines in this territory," and the Midwest Distributors contract grants to the taxpayer " the exclusive right to the sales through direct retail distribution in Greater New York territory." The Biosophical Institute, Inc., contract makes the taxpayer " the sole distributor of this magazine in this territory." Other contracts are of similar import. It seems obvious that, by the intention of the parties, the taxpayer is only an agent.

If one considers the contract from the standpoint of the passing of title, while none but the Macfadden contract specifically retains title to the magazines in the publishers, the language in the other contracts shows various significant circumstances. Control of the resale prices is fixed by the publishers, which the agent must maintain. The contracts in general allow the distributor to deduct on periodic settlements of accounts a percentage as compensation for distribution. Some contracts provide for periodic reports to the publisher showing the number of copies distributed. Under the contracts the taxpayer is under a duty to promote sales for the publishers. In Midwest Distributors contract it is specifically

provided that the magazines are " on consignment " to the taxpayer and before it allows credit on unsold copies the taxpayer must recover from the retailers unsold copies which are the property of the publisher. None of the contracts provides that the taxpayer will buy any specific number of magazines. It is true that the taxpayer is responsible for the credit extended to retailers but this is without significance. It is a common business arrangement for local agents to guarantee the credit of retailers, as may be seen in the ordinary factor's contract. The distributor is in a better position to pass on local credit than the publisher and his compensation is sufficient to cover the risk. For the purposes of the question herein discussed, we find no intention to pass title to the taxpayer.

All the contracts provide for numerous duties to be performed by the taxpayer which are consistent with an agency status only. Among such things which the taxpayer must do are to keep all customers supplied with periodicals, to distribute the publisher's advertising posters and other advertising material to the retailers, to report itemized sales made by retailers, to co-operate in increasing the sales of periodicals, to deliver promptly magazines received, to permit a representative of a publisher to inspect any delivery on any route upon request, to make special deliveries of extra copies to retailers, to receive an extra allowance for picking up unsold copies, to keep, draw and return records for each retail account, to check the stock of retail dealers at specified times, and so forth. We think these special duties are quite inconsistent with any theory that the taxpayer is the purchaser of these magazines.

Evidence was introduced at the hearing before the comptroller showing the practical construction put upon the contracts by both the publishers and the taxpayer. Regardless of the different details of the various contracts, in practice the taxpayer performs each contract in a similar manner. The magazines are received several days before the day of distribution. The publisher fixes the day of distribution and the number of magazines which are to be delivered. The publisher has the final decision as to the number of magazines to be shipped to the taxpayer. It appears that most of the publishers have representatives or employees in the taxpayer's office who have access to the records that are kept of the newsdealer's supplies and routes. These employees confer with the taxpayer to determine the number of magazines that will be delivered to each newsdealer. They watch the returns to check whether too many magazines have been sent out to a particular retailer. Desk space is set aside in the taxpayer's office for these publishers' employees. They are privileged to examine the taxpayer's files with reference to orders for their employer's publications. They

inspect the various retail stands and check up to see if their publications are getting a proper display and to see if the newsdealer has a sufficient quantity. If there are complaints, they make them to the taxpayer. If they find a condition which they think is not as it should be in respect to proper numbers of magazines at one or another retail stand, they will transfer some of the magazines from one stand to another. This may even be done without consulting the taxpayer, though a report is made later. These employees also are privileged to ride over the routes with the taxpayer's delivery men. Finally, it may be pointed out that the accounting procedure of the taxpayer is consistent with an agency relationship and not with a vendor and vendee relationship.

At the time these contracts were made, it would have been an unlawful restraint of trade to sell the magazines to the taxpayer under an agreement to resell only at fixed prices. (*Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373; *Boston Store* v. *American Graphophone Co.*, 246 id. 8.) On the other hand, if the relationship were that of principal and agent, it was well established that the principal might fix the sales price to be received by the agent. (*United States* v. *General Electric Co.*, 272 U. S. 476.) While at the present time under the Feld-Crawford Act and similar statutes, the contracts might be legal under either interpretation of the status of the taxpayer, it is not to be assumed that at the time they were made the parties were attempting to contract for an illegal relationship. The contrary must be assumed.

All the details above adverted to lead to the conclusion that this is an agency contract. This view is supported by the interpretation put upon a similar contract in *Curtis Publishing Co.* v. *Federal Trade Commission* (270 Fed. 881). That case arose under the Clayton Act. If the relationship between the publisher and the distributor created by that contract had been that of vendor and vendee, the contract would have been a violation of the Clayton Act. The contract was examined and the court said (p. 906):

" We note, first that the agreement, which is entitled a ' District Agency Agreement,' is in form and verbiage an appointment by a publisher of an agent, and an agent for limited territory and for a mutually optional time, for the purpose of (a) selling and (b) distributing its magazines. Now, there are no words in the contract which purport or contemplate the sale of such magazines, and there is express provision if (a) a sale, or (b) a distribution, to third parties is not effected, the magazines consigned are to be returned to the publisher. Indeed, the nature of the transaction, the necessary haste to get the magazines into the hands of the boys at once,

shows of itself that there was no reason for transferring title by sale. It was not the handling of commodities of which sales would naturally be made. It was a contract for distributing and speeding up deliveries of an article whose whole value depended on the haste with which it passed from the agent's possession. Confirming these statements, we note that in clause 1 ' appoint the said second party as district agent for the Saturday Evening Post,' etc., are words aptly used in constituting an agency, viz.,' appoint,' and of restricted territory, ' district agent.'

" We note that clause 3 provides for the return and credit, at consignment prices, of unsold copies and that clause 5 provides for the payment of interest at 5 per cent. on the money deposit, made by the agent, as security for the magazines consigned. As to the agent making sales of the magazine, clause 8 obligates him to sell a certain number of copies of the magazine, and clause 9 binds him to deliver the magazine to dealers and boys ' early on the morning of the sale date ' and at certain specified prices. We also note that by clause 10 the agent binds himself not to display, distribute, or sell any of the magazines before an authorized sale date, and by clause 11 not to sell any copies in territory controlled by another agent. All of these and other details that might be cited evidence that the relation created by this contract, and by its expressed terms meant to be created, was one of agency, and that there is an entire absence in the contract of any terms or words usual or requisite to effecting or evidencing a sale, as well as of circumstances inviting or necessitating a sale."

It will be noticed that the facts which were stressed by the Circuit Court of Appeals as showing an agency relation are similar to those that we have mentioned above as being found in the instant contracts. There can be no reasonable doubt that these contracts were intended to be, and are, agency contracts.

Under the law, the comptroller issues rules and regulations. Article 27 of these Rules and Regulations in effect during each of the taxable years in question provided: " Receipts from sales by an agent for the account of his principal are the receipts of the principal and are to be reported by the principal. The agent is to report as his receipts the amount thereof withheld by him as his compensation before remitting to his principal, and/or the compensation received by him from his principal." This is the procedure that has been followed by the taxpayer and we find no reason for criticizing that prodecure.

The determination of the comptroller of the city of New York should be set aside and the respondents should be directed to refund to the taxpayer the sum of $4,978.87 deposited with the comptroller under protest, with interest from April 8, 1939.

MARTIN, P. J., UNTERMYER and COHN, JJ., concur; CALLAHAN, J., dissents and votes to affirm.

CALLAHAN, J. (dissenting). Under the Local Laws involved herein a tax was imposed on " the gross receipts received in, or by reason of any sale made or services rendered or commercial or business transaction had in, the city of New York, including cash, credits and property of any kind or nature, without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or service or other cost, interest or discount paid, or any other expense whatsoever." Therefore, if petitioner received the moneys from the sale of the magazines involved herein as its own, and not as agent for the publishers, or in trust for them, these receipts would be taxable.

Unquestionably, under the contracts involved herein the relation between the parties was in some respects that of principal and agent. (*Curtis Publishing Co.* v. *Federal Trade Commission*, 270 Fed. 881; affd., 260 U. S. 568.) It seems quite clear, however, that as to the receipts from customers the petitioner received them as its own, and not as agent for the publishers. It had legal and equitable title thereto, being the debtor of the publisher for the net price of the magazines retained. The only exception to this situation would seem to be the contract with the Macfadden Publications, Inc., as to which the city admits an agency relation existed with respect to the receipts.

There is nothing in article 27 of the comptroller's regulations which exempts petitioner as to the receipts taxed, for they were not receipts from sales made for the account of the publishers.

The determination should be affirmed, for the tax was properly imposed.

Determination of the comptroller of the city of New York set aside and the respondents directed to refund to the taxpayer the sum of $4,978.87, deposited with the comptroller under protest, with interest from April 8, 1939. Settle order on notice.