THE CLEVELAND GRAPHITE BRONZE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9030. Promulgated May 27, 1948.

*William B. Cockley, Esq.*, for the petitioner.
*Howard M. Kohn, Esq.*, for the respondent.

976

OPINION.

VAN FOSSAN, *Judge*: The first question presented is the amount of "daily capital addition" to be used in the computation of excess profits credit pursuant to section 713.

In computing its excess profits credit under that section, a taxpayer is entitled to include an amount equal to (A) 95 per centum of its average base period net income, plus (B) an additional amount equal to 8 per centum of the "net capital addition" as defined in subsection (g), or minus (C) 6 per centum of the "net capital reduction" as defined in subsection (g). The "daily capital addition" which enters into the computation of "net capital addition" is defined in subsection (g) (3) as "the aggregate of the amounts of money * * * paid in for stock, or as paid-in surplus, or as a contribution to capital, after the beginning of the taxpayer's first taxable year under this sub-chapter * * *."

In 1941 the petitioner sold 30,000 shares of its preferred stock. The question to be determined as to this transaction is whether "daily capital addition" is $3,000,000, the agreed purchase price received by petitioner for the 30,000 shares, or $2,895,000, the net amount after payment by petitioner of $105,000 to the underwriters as commission for service. More directly stated, the question is whether $3,000,000 or $2,895,000 is, under the statute, the amount "of money * * * paid in for stock." The petitioner contends that the daily capital addition under the statute is the amount of $3,000,000, whereas the respondent contends it is the amount of $2,895,000. The petitioner relies upon *Simmons Co.*, 8 B. T. A. 631; affd. (C. C. A., 1st Cir.), 33 Fed. (2d) 75; certiorari denied, 280 U. S. 588; *Magee Furnace Co.*, 11 B. T. A. 1216, and *Finance Corporation of New England*, 16 B. T. A. 763. The respondent relies primarily upon *Corning Glass Works*, 9 B. T. A. 771; affirmed and reversed in part (App. D. C.), 37 Fed. (2d) 798; certiorari denied, 281 U. S. 742.

It is argued by petitioner that, pursuant to normal financial practice, a public offering of the 30,000 shares at $100 a share was accomplished through the mechanics of a sale to the underwriters on March 4, 1941, after the public offering had been made, with all or a substantial portion of the funds paid by the underwriters to petitioner having been supplied by the public investors in the stock, and that while in legal form at the moment of the consummation of the sale the underwriters were the legal purchasers of the stock, they had already sold the stock to the public and were in fact merely conduits through which the ownership of the stock passed from petitioner to the ultimate purchasers.

Invested capital under section 718 (a) (1) of the Internal Revenue Code consists in part of "(1) Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital." Factor (1) entering into the computation of the excess profits credit based on invested capital is essentially comparable to the factor "daily capital addition" entering into the computation of the excess profits credit based on income. The statutory definition of each factor is the same, i. e., money paid in for stock, or as paid-in surplus, or as a contribution to capital.

The question presented in *American Business Credit Corporation*, 9 T. C. 1111, was whether the amount paid in by stockholders for taxpayer's stock or the net amount of cash made available to the taxpayer (its broker agent having retained certain commissions for making the sale of such stock) was "money * * * paid in for stock" under section 718 (a) (1). Therein it is stated:

> We think it clear that the question before us is to be approached and answered from the viewpoint of the stockholder, i. e., "money previously paid in for stock." So approached, the conclusion is obvious that the full amount which the stockholder paid for his stock is to be included in equity invested capital, as contemplated by the statute. The stockholder paid one sum, viz., the purchase price of the stock.

Comparable reasoning is apt in the instant case.

It is to be noted, however, that in *American Business Credit Corporation, supra*, it was expressly found that the broker did not purchase the shares involved, but in each case found purchasers for the stock and caused the taxpayer to issue shares of stock against payment of the purchase price therefor by the purchasers thereof. Similar findings were made in *Simmons Co., supra; Magee Furnace Co., supra*, and *Finance Corporation of New England, supra*, i. e., that the amounts involved had been paid in by the persons to whom the stock was issued.

The facts as disclosed by the record herein are that petitioner entered into an underwriting agreement with two underwriters in February 1941, covering the purchase by them of 30,000 shares of a newly authorized issue of preferred stock from the petitioner at $100 per share, petitioner to pay the underwriters a commission for their services of $3.50 per share, or a total of $105,000. The agreement required that the underwriters initially offer the stock to the public at not in excess of $100 per share. The shares were publicly offered on February 26, 1941, at $100 a share. On March 4, 1941, the underwriters paid petitioner $3,000,000 and the petitioner paid the underwriters $105,000, and at the same time delivered to one underwriter certificates for 15,515 shares and to the other certificates for 14,485 shares, or a total of 30,000 shares.

Although it appears that the stock was offered to the public at $100

a share, there is no evidence that the 30,000 shares or any of them were actually sold to the public. In so far as the record shows, the 30,000 shares were purchased by the underwriters and the certificates therefor were delivered to them. The record is silent as to whom such certificates were issued. There is no evidence to sustain petitioner's argument that the funds paid to it by the underwriters had been supplied by public investors in the stock. The petitioner has failed to bring the transaction within the ambit of the cases relied upon by it.

It is stated in *Simmons Co.*, *supra*, that "under no circumstances can invested capital be *increased* by the amount of commission which a corporation pays for the sale of its stock to those who thereby become stockholders."

It is our conclusion, therefore, that the amount of "daily capital addition" as defined in section 713 (g) (3) is $2,895,000, and that the Commissioner did not err in reducing the amount of $3,000,000 received by petitioner from the underwriters by the commission of $105,000 paid by petitioner to the underwriters for services rendered.

The petitioner purchased from the holders thereof 680 shares and 364 shares of its preferred stock which it retired on June 25, 1942, and August 22, 1942, respectively. It paid for such stock the aggregate amounts of $67,145 and $36,138, respectively. Both the petitioner and respondent used the par value of such shares of $68,000 and $36,400 as the daily capital reductions in computing net capital addition for the purpose of determining the excess profits credit.

Section 713 (g) (4) provides that:

The daily capital reduction for any day of the taxable year shall be the aggregate of the amounts of distributions to shareholders, not out of earnings and profits, after the beginning of the taxpayer's first taxable year under this subchapter * * *.

The respondent on brief concedes that only the amounts actually paid by the petitioner should be treated as the daily capital reductions resulting from the retirements of its preferred stock. This, in our opinion, is in accord with the statute. See *Simmons Co.*, *supra*.

The next question to be considered is whether the aggregate amounts of quarterly payments of $42,382.91 and $77,816.12 received by petitioner in 1941 and 1942 from Vandervell Products Ltd. are ordinary income or long term capital gains, excludible from excess profits net income under section 711 (a) (1) (B) of the Internal Revenue Code.

It is contended by petitioner that the amounts received by it were installments of the agreed sale price of its British patents and therefore representing long term capital gains, to be excluded in determining excess profits net income. The respondent contends that the 1938 agreement did not constitute a sale of petitioner's British patents.

Whether a transfer of an interest or right under a patent is an assignment or only a license does not depend upon the name by which

the agreement is called, "but upon the legal effect of its provisions." *Waterman* v. *Mackenzie*, 138 U. S. 252. No particular form is required for an assignment, "but the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent." *Kenyon* v. *Automobile Instrument Co.*, 160 Fed. (2d) 878, 882. A transfer, to constitute an assignment, must be a grant of either (1) the whole patent, comprising the exclusive right to make, use, and vend an invention throughout the United States, or (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and throughout a specified part of the United States. *Waterman* v. *Mackenzie, supra; United States* v. *General Electric Co.*, 272 U. S. 476, 489; *Kenyon* v. *Automobile Instrument Co., supra,* and *Federal Laboratories, Inc.*, 8 T. C. 1150. As stated in the leading case of *Waterman* v. *Mackenzie, supra:*

\* \* \* Any assignment or transfer, short of one of these is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. \* \* \* In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff. \* \* \* the grant/ of an exclusive right under the patent within a certain district, which does not include the right to make, and the right to use, and the right to sell, is not a grant of a title in the whole patent right within the district, and is therefore only a license. \* \* \* So is an instrument granting "the sole right and privilege of manufacturing and selling" patented articles, and not expressly authorizing their use, because, though this might carry by implication the right to use articles made under the patent by the licensee, it certainly would not authorize him to use such articles made by others.

An assignment gives the transferee the right to sue for infringement, while a license gives a transferee merely immunity from suit for infringement. "The first gives positive rights, the second negative rights." Ridsdale Ellis, Patent Assignments and Licenses (2d Ed.), § 57, p. 63.

Under the agreement dated July 28, 1938, petitioner granted to Vandervell Products Ltd., hereinafter referred to as Vandervell, "the sole and exclusive license" under the letters patent involved to be held by Vandervell for its own benefit for the remainder of the term for which such letters patent were respectively granted and any extension or renewal thereof "upon and subject to the terms and conditions" set out in the letter agreement of November 28, 1932. This requires reference to the letter agreement of 1932.

Such letter agreement is a confirmation of an arrangement, arrived at after various conferences between the parties, under which Vandervell "would be licensed to *manufacture and sell,* in England, *various*

*products*" covered by petitioner's English patents and patent applications, both pending and proposed. (Emphasis supplied.) This arrangement was to be effective from December 1, 1932, to October 31, 1933, but was continued in effect until 1938 without any formal renewal. During that period Vandervell was required to pay quarterly to petitioner certain royalties on various products manufactured by Vandervell, as specified in the letter agreement.

The 1938 agreement granted an exclusive license without any enumeration of the rights to be exercised thereunder. Construing the 1938 agreement in conjunction with the 1932 letter agreement, as we must, and applying the principles heretofore set forth, the 1938 agreement was no more than an exclusive license to make and sell various products covered by petitioner's English patents. The transfer was not a grant of the whole of the English patents. One of the three rights comprising the whole thereof, i. e., the right to use, was not expressly included in the grant. A grant of an exclusive right under a patent within a certain district which does not include the right to make, the right to use, and the right to sell, is only a license. *Waterman* v. *Mackenzie, supra.*

All but two of the 12 patents listed in the 1938 agreement were held by trustees. It is conceded by petitioner on brief that as to such patents "legal title remained in the trustees." If the agreement did not effect a transfer of legal title as to the patents held by the trustees, it did not effect a transfer of legal title of the patents in the name of petitioner. It retained title to the patents and after the execution of the 1938 agreement it continued to pay the annual fees required under British patent law to maintain patents in effect, on all patents listed in the agreement and those acquired thereafter.

*Edward C. Myers*, 6 T. C. 258, cited by petitioner, is distinguishable. Therein the agreement granted an exclusive license, together with the right to grant sublicenses, to make, use, and sell through the United States, its territories and possessions. All three rights were expressly granted. The agreement in *Parke, Davis & Co.*, 31 B. T. A. 427, also cited by petitioner, was a grant of an undivided part or share of the three exclusive rights, i. e., to make, to use, and to sell. In *Commissioner* v. *Celanese Corporation of America*, 140 Fed. (2d) 339, and *Commissioner* v. *Hopkinson*, 126 Fed. (2d) 406, both cited by petitioner, the owners of United States letters patent not only executed agreements containing language showing a clear and unmistakable intent to part with the whole of the patents, but also executed assignments of each of the patents which were recorded in the United States Patent Office.

Clearly, under the laws of the United States the 1938 agreement was but a license and not an assignment. Neither, as we shall see, was it an assignment of the patents under English law.

Petitioner's expert witness as to British patent law testified that, in his opinion, the 1938 agreement was irrevocable and an effective transfer of all the rights of petitioner under the patents involved and that petitioner's only remaining right thereunder was the collecting of royalties as provided in the letter agreement of 1932. His opinion was entirely based upon certain English cases which, however, in our judgment, do not support his opinion. *Guyot* v. *Thomson*, 11 R. P. C. 541, a leading British patent case which he cited as supporting his opinion, was an action brought by the exclusive licensee against the patentee and licensor. By written instrument the patentee had granted an "exclusive license to manufacture, use and vend the inventions" during the unexpired terms of the patents, with the right to grant sublicenses. The agreement, among other things, provided that the patentee should not commence proceedings for infringement without the consent in writing of the licensee. Upon appeal, the question involved was whether the exclusive license granted by the instrument involved was revocable by the patentee. The patentee had attempted by written notice to revoke the license on account of alleged breaches of the licensee of certain conditions. He contended that the agreement was a mere license, not a grant. The court held that the license was not revocable because "on the face of the document, there is an implied covenant not to revoke." The court pointed out that the agreement contained several clauses which were inconsistent with the right to revoke. Although the license granted was an exclusive license to make, use, and vend the inventions, with the right to sublicense, the court stated:

* * * They [licensees] are not assignees of the patent. We were asked to construe this—or it was suggested that we might construe this: as amounting to an assignment of the patent, but the clause that the right to sue for an infringement is in the patentee excludes that view. It is not, therefore, quite an assignment of the patent. There is not very much difference in it, but that clause prevents us from holding that it is an assignment of the patent.

Neither does the case of *Heap* v. *Hartley*, 6 R. P. C. 495, also cited by petitioner's expert witness, support his opinion. In that case the patentee of a machine granted an exclusive license to use and exercise his invention within a certain district for four years and the deed conferring the license was registered at the Patent Office. The licensee brought an action to restrain the use by a third party of certain machines purchased outside of his district but taken within his district and used there. The court held that, since the license was a simple license and not a grant, the licensee was not entitled to sue in his own name without the joinder of the patentee. It stated, in part, as follows:

* * * An exclusive license is only a license in one sense. That is to say, the true nature of the exclusive license is this. It is a leave to do a thing, and a contract not to allow anybody else to do a thing. But it confers no more than

any other license any interest or property in the thing. A license may be, and often is, coupled with a grant, and that grant then may convey an interest in property, but the license pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully.

Furthermore, petitioner's expert witness conceded that the 1938 agreement contained no provision granting to Vandervell the right to assign any of the patents to third parties, that the license granted was personal to, and exercisable only by, Vandervell, and that if Vandervell desired to bring suit for infringement it would have to join petitioner as either party plaintiff or defendant.

Thus, under British law, as under the laws of the United States, a transfer which gives to the licensee no title to the patents and no right to sue in his own name for infringement is but a license and not an assignment. The 1938 agreement, therefore, did not effect a sale of the patents. Accordingly, the respondent did not err in treating the royalties received in 1941 and 1942 as ordinary income.

It is contended by petitioner that, if the amounts received as royalty are determined to be ordinary income, then the total amounts of royalty under the agreement should be included in income and a credit against taxes of the amounts retained as British taxes by Vandervell should be allowed under section 131 (a) (1) of the Internal Revenue Code. A similar question was considered by this court in *Irving Air Chute Co.*, 1 T. C. 880; affd. (C. C. A., 2d Cir.), 143 Fed. (2d) 256. In that case a British company also retained a certain amount of royalties due under an agreement to the taxpayer. It was held that the British tax was levied upon, assessed against, and paid by the English company, was not the taxpayer's tax within the meaning of our statute, and, hence, the taxpayer was not entitled to the credit under section 131 (a) (1).

*Wisconsin Gas & Electric Co.* v. *United States*, 322 U. S. 526, and *International Harvester Co.* v. *Wisconsin Department of Taxation*, 322 U. S. 435, involving the Wisconsin privilege dividend tax, cited by petitioner, are not applicable.

It was stipulated that the allowance by respondent in his amended answer of additional deductions of $4,227.26 for 1941 and $224,132.95 for 1942 for amortization of emergency facilities as a result of petitioner's election to terminate amortization under the provisions of section 124 (d) of the Internal Revenue Code was proper and that the amounts so allowed may be accepted as correct and given effect in the computation under Rule 50.

It is conceded by petitioner that it is not entitled to the deduction from gross income for 1942 of the amount of $172.67 as a loss sustained upon the disposal of certain emergency facilities as claimed by it.

*Decision will be entered under Rule 50.*