Mb. Justice StewaRT,
dissenting.
In this case the District Court granted a summary judgment in favor of the respondent, finding that the respondent had not violated the Sherman Act, and that even if there had been a violation, the petitioner had not suffered any damages. The Court of Appeals affirmed upon the theory that, even assuming a Sherman Act violation, “any damage occurring to Simpson was the result of his own free and deliberate choice and he could not deliberately and knowingly enter into contractual obligations and then and thereafter contend he was injured by the results of his own acts.” 311 F. 2d 764, at 769.
I think the reasoning upon which the Court of Appeals proceeded is untenable. The gravamen of the petitioner’s complaint was that he had been coerced into a lease conditioned upon acceptance of the respondent’s allegedly unlawful system of selling. If, as the Court of Appeals assumed, there had been such a violation of the Sherman Act, it was inconsistent to assume that the petitioner could not have been subject to the coercion he alleged and could not have suffered damages. But the root error in this case, it seems to me, was the District Court’s decision to terminate the controversy by way of a summary judgment. I therefore agree with the Court that the judgment of the Court of Appeals should be set aside and the case remanded to the District Court for a *158 trial on the merits. Poller v. Columbia Broadcasting System, 368 U. S. 464. But I think that upon remand there should be a full trial of all the issues in this litigation, because I completely disagree with the Court that whenever a bona fide consignor, employing numerous agents, sets the price at which his property is to be sold, “the antitrust laws prevent calling the 'consignment’ an agency,” and transform the consignment into a sale. In the present posture of this case, such a determination, overruling as it does a doctrine which has stood unquestioned for almost 40 years, is unwarranted, unnecessary and premature.
In United States v. General Electric, 272 U. S. 476, this Court held that a bona fide consignment agreement of this kind does not violate the Sherman Act. The Court today concedes that “the consignment in that case somewhat parallels the one in the instant case.” The fact of the matter is, so far as the record now before us discloses, the two agreements are virtually indistinguishable.[1] Instead of expressly overruling General Electric, *159 however, the Court seeks to distinguish that case upon the specious ground that its underpinnings rest on patent law.
It is, of course, true that what was sold in General Electric was not gasoline, but lamp bulbs which had been manufactured under a patent. But until today no one has ever considered this fact relevant to the holding in *160 that case that bona fide consignment agreements do not violate the antitrust laws “however comprehensive as a mass or whole in their effect . . . Id., at 488. In addition to the unambiguous statement in Chief Justice Taft’s opinion for a unanimous Court that “[t]he owner of an article, patented or otherwise, is not violating the common law, or the Anti-Trust law, by seeking to dispose of his article directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer,” 272 U. S., at 488, the Court, throughout that portion of its opinion dealing with the validity of General Electric’s consignment agreements, gave no intimation whatsoever that its conclusion would have differed in any respect if the consigned article had been unpatented. Quite the contrary, the General Electric Court, assessing the validity of these agreements, addressed itself to but one question: “The question is whether, in view of the arrangements, made by the company with those who ordinarily and usually would be merchants buying from the manufacturer and selling to the public, — such persons are to be treated as agents, or as owners of the lamps consigned to them under such contracts.” 272 U. S., at 483-484.
To answer that question, the Court examined the operative provisions of the consignment agreement to determine whether the agreement created a valid agency or whether, in fact, title effectively passed to the so-called consignee. Id., at 483-488. If the latter were the case, the price-fixing requirement would have made the agreement nothing more than a resale-price-maintenance scheme, unlawful under the antitrust laws, cf. Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, regardless of whether or not the article sold was patented. Similarly, if the agreement created a bona fide agency, the consignment would be valid under the antitrust laws, again regardless of whether or not the article consigned were patented.
*161 Possession of patent rights on the article allegedly-consigned has no legal significance to an inquiry directed to ascertaining whether the burdens, risks, and rights of ownership actually remain with the principal or have passed to his agent. Nor is the power of a consignor to fix the prices at which his consignee sells augmented in any respect by the possession of a patent on the goods so consigned. It is not by virtue of a patent monopoly that a bona fide consignor may control the price at which his consignee sells; his control over price flows from the simple fact that the owner of goods, so long as he remains the owner, has the unquestioned right to determine the price at which he will sell them.[2]
It is clear, therefore, that the Court today overrules' General Electric. It does so, even though the validity of that decision was not challenged in the briefs or in oral argument in this case. I should have thought that a decision of such impact and magnitude could properly be reached only after careful consideration of all relevant considerations and preferably by a full Court.[3] Today’s upsetting decision carries with it the most severe consequences to a large sector of the private economy. We cannot be blind to the fact that commercial arrangements throughout our economy are shaped in reliance upon this Court’s decisions elaborating the reach of the antitrust *162 laws. Everyone knows that consignment selling is a widely used method of distribution all over the country. By our decision today outlawing consignment selling if it includes a price limitation, we inject severe uncertainty into commercial relationships established in reliance upon a decision of this Court explicitly validating this method of distribution. We create, as well, the distinct possibility that an untold number of sellers of goods will be subjected to liability in treble damage suits because they thought they could rely on the validity of this Court’s decisions.
If the record now before us actually required re-examination of the General Electric case, I think that in view of the serious considerations which I have mentioned we should set this case for reargument and invite the Justice Department to express its views.[4] But the fact is that in the present posture of this case, this broad issue need not be decided. The record upon which the District Court entered its summary judgment is wholly inadequate to support a realistic assessment of the actual nature and effect of the so-called lease-and-consignment agreement here involved. As the Court of Appeals pointed out, “[t]he record is not an easy one to read. No written pretrial stipulation of facts was entered into nor was any formal pretrial order made. . . . The result of all this was to create a most unsatisfactory record .... As the record now stands, it is almost impossible to determine what agreements, if any, were reached at pretrial.” 311 F. 2d, at 767.
*163 After a trial on the merits it may be determined that the scheme here involved, although on its face a bona fide lease-and-consignment agreement, was in actual operation and effect a system of resale price maintenance.[5] Or the District Court after a trial might find that despite the formal provisions of the lease-and-consignment agreement, there actually existed here some coercive arrangement otherwise violative of the antitrust laws. In either event, the question of the petitioner’s damages would then become an issue to be determined. Only if all these issues, and perhaps others, were resolved in favor of the respondent, would there be presented the question of the continuing validity of the General Electric doctrine. Consequently, re-examination of that case should certainly await another day.
I would vacate the judgment of the Court of Appeals and remand this case to the District Court for a plenary trial of all the issues.
Memorandum of
Mr. Justice Brennan and Mr. Justice Goldberg.
We do not necessarily disagree with the Court that “resale price maintenance through the present, coercive type of 'consignment’ agreement is illegal under the antitrust laws, and that petitioner suffered actionable wrong or damage.” We think, however, that the Court should not decide that question either as to fact or law on the record upon which this summary judgment was entered. Since the decision may be expected to affect consignment agreements in many businesses, including outstanding agreements that may have been entered into in reliance upon United States v. General Electric, 272 U. S. 476, the Court ought not pronounce that judgment without *164 the benefit of a trial of the question whether this is a “coercive type of 'consignment’ agreement,” and without affording interested parties, including the Antitrust Division of the Department of Justice, an opportunity to express their views. We therefore agree with Mr. Justice Stewart and would vacate the judgment of the Court of Appeals and remand this case to the District Court for a plenary trial of all the issues.

 Without commenting on their significance, the Court does purport to discover in the operative provisions of the two agreements factual differences regarding the tax and insurance burdens assumed by the consignors. On closer examination, however, even these purported differences disappear. From the records in the cases, it is clear that both companies assumed the same tax burden' — payment of property taxes on the consigned goods. And since both companies bore virtually the same insurable risks of loss or damage to the goods consigned, the fact that General Electric apparently "carried 'whatever insurance is carried’ on the stock held by consignees, while Union Oil apparently is not obligated to carry any insurance” is no distinction at all.
The Court implies that the terms of this agreement providing that the consignee must carry personal liability and property damage insurance; that the consignee is responsible for losses of consigned gasoline incurred in the ordinary course of events; and that the consignee must pay his own costs of operation, are inconsistent with a valid consignment agreement. But such provisions are common to *159 consignment agreements. They merely illustrate the well-recognized fact that these retail gasoline dealers are both independent businessmen and agents. A consignee is commonly defined as one who “in the pursuit of an independent calling,” is engaged by another as his agent to sell property. See, e. g., Calif. Civil Code § 2026. Consequently, it is not at all surprising for a consignment agreement to provide both that a consignee bear the expenses of conducting his own business, and that he be responsible for loss or damage to the goods occurring in the ordinary course of business. The Court in General Electric explicitly found such provisions unobjectionable, 272 U. S., at 48A-485, and further observed that a provision placing the burden of risk of loss or damage to goods on the consignee “is only a reasonable provision to secure [the consignee’s] careful handling of the goods entrusted to him.” Id., at 484. Nor is the requirement that Simpson carry property damage and personal liability insurance of significance. Such a provision serves the reasonable purpose of protecting the consignor from responsibility (which might be imputed by virtue of the agency relationship) for liabilities incurred by Simpson arising out of or in connection with Simpson’s business.
The only remaining point which the Court makes is that the consignee’s commission declines as retail prices drop. But it is in the very nature of commissions that they be geared to prices, and it is thus typical of consignment agreements that the consignee bears some of the risk of price declines. In fact, the consignment agreement challenged in the General Electric ease provided that “[t]he agent is allowed a compensation of 10% of the list prices of the lamps ...” Since the General Electric Company set the list price, it would have been as correct to say in that ease, as it is in this one, that the consignee’s commission declined as retail prices dropped. Moreover, under Union’s agreement, Simpson received a minimum guaranteed commission regardless of the extent of price declines, thereby substantially restricting his exposure to the risks of a decline in the market price.

 The quotations in the majority opinion from the General Electric ease relate to a wholly separate second issue involved in that case— the validity of a license granted by General Electric to Westinghouse, under the patents owned by the former, to manufacture and sell lamps at prices fixed by the patentee-licensor — and have no relevance whatsoever to the issue here. Since the source of power over price by the patentee-consignor in General Electric was not his patent, and since the question of patent monopoly is not involved in this case, the patent cases cited by the Court are also singularly irrelevant to the issue here.

 There is no reason to suppose that Mr. Justice Harlan will be disqualified in any future case which may involve the question of the continuing validity of the General Electric rule.

 The Department's views are not known, because they have not been sought. Indeed, had they been sought, there is a substantial possibility in light of the Department's recognition and tacit validation of consignment selling under the 1959 consent decree entered against the large West Coast oil companies, United States v. Standard Oil Co. of California, 1959 Trade Cases ¶ 69,399, p. 75,522 et seq., that the Government would have taken the position that the rule of General Electric should be left undisturbed.

 In that event, the effect of California’s Fair Trade Act, Cal. Bus. & Prof. Code § 16900, would have to be considered. See 66 Stat. 631, 16 U. S. C. § 45 (McGuire Act).