**WESTINGHOUSE ELECTRIC CORPORA-
TION v. BULLDOG ELECTRIC
PRODUCTS CO.**

Civ. A. No. 229–W.

United States District Court
N. D. West Virginia.

Jan. 31, 1949.

James M. Guiher and Steptoe & Johnson, all of Clarksburg, W. Va., and Victor S. Beam and Thomas J. Byrne, both of New York City, for plaintiff.

Charles P. Mead and Goodwin, Nesbitt, Spillers & Mead, all of Wheeling, W. Va., and Daniel G. Cullen, Jacob L. Keidan, and Butzel, Levin, Winston, Youngjohn and Quint, all of Detroit, Mich., for defendant.

BAKER, Chief Judge.

On November 10, 1943, the plaintiff, then known as Westinghouse Electric & Manufacturing Company, filed its complaint against Bulldog Electric Products Company, alleging that the defendant was infringing certain patents owned by the plaintiff for the manufacture of circuit breakers. A circuit breaker is a device for cutting electric current out of a circuit when the power load becomes dangerously high. The basic principle of the device had been known and used for years.

In the early 1930's, the Westinghouse Company decided that it would be advantageous to manufacture a small circuit breaker which would retail at a low enough price to be used in private homes and small commercial buildings in place of fuses then and still commonly in use. The circuit breaker is more convenient to use than a fuse, and does not require the user to keep on hand a supply of replacement fuses. The Westinghouse Company was issued certain patents under which the device, known as the AB circuit breaker, could be manufactured.

At about the same time, the Square D Company had pending applications for patents of a similar nature. Interferences arose in the patent office between Westinghouse and Square D in connection with the latter's applications. These were re-

solved by Square D's conceding priority to Westinghouse. At the same time, Westinghouse gave Square D a license under its patents, and received from Square D a license under Square D's patents. The Square D patents covered an improvement in the commercial application of the Westinghouse patents and, by use of both patents, a circuit breaker, known as the Multibreaker, could be manufactured.

It was agreed that Westinghouse would issue Multibreaker licenses under its patents, and the royalties derived therefrom would be split between Westinghouse and Square D in the proportion of sixty to forty, if Square D issued non-assertion agreements to the Westinghouse licensees. For the purposes of this case, I can see no distinction whatever between a non-assertion agreement and a license. Westinghouse issued several licenses under this contract, and Square D issued non-assertion agreements to the licensees involved. In most instances, the non-assertion agreement was issued practically simultaneously with the Westinghouse license. The license agreements provided, among other matters, that the licensee could not sell the patented product for a cheaper price than that charged by Westinghouse, and Westinghouse, from time to time, issued a schedule of prices and terms, which the licensees were required to observe.

On January 10, 1944, the defendant filed a motion for summary judgment of dismissal upon the grounds that the patents in suit were being illegally used as a part of a combination in restraint of trade. This motion was overruled May 23, 1944, because I felt that the doctrine of United States v. General Electric Co., 272 U. S. 476, 47 S.Ct. 192, 71 L.Ed. 362, permitted the type of price control complained of in this case. On July 1, 1944, the defendant's answer was filed.

After several other steps and hearings, it came to the attention of the court that there was a suit pending in the Eastern District of New York between these same parties, which involved these same patents. The New York suit had proceeded much further than the one in this court. There was an indication that the New York litigation would settle many, if not all, of the issues before me and, since it had started before the case here, I stayed the proceedings in this District on March 2, 1945. There was no objection by either party to this suit to the stay. On May 17, 1948, after the proceeding in the Eastern District of New York had terminated, both in the district and appellate courts, this stay was lifted, and the case here resumed.

The defendant again filed a motion for summary judgment of dismissal, alleging generally the same grounds it had urged in its prior motion. However, in the meantime, two decisions had been handed down by the United States Supreme Court, clarifying that Court's ruling in the General Electric case and, in my opinion, materially modifying what I had thought was the rule of that decision. These cases were United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. ——, and United States·v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. ——. It might be noted here parenthetically that the lower courts apparently agreed with my interpretation of the General Electric decision. The basic ruling in these cases, reduced to its simplest terms, is, in effect, that while under the General Electric decision one patent owner may issue a license to one licensee and, as a condition of that license, restrict the price which the licensee must charge for the finished product, two or more patent owners can not combine their patents and issue licenses under the combination and restrict the terms at which the resulting article can be sold. It is the contention of the defendant that, in the instant case, we have a combining of patents by different owners, and the use of the combined patents in a manner that fixes prices, in violation of the Sherman Anti-Trust law. The plaintiff contends that it has not used its patents illegally or that if there has been a misuse in some instances, that misuse has been purged.

I do not deem it necessary in this memorandum to go into all the arguments and authorities advanced by the respective parties. Each party knows the positions taken and authorities cited in support therefor. I deem it sufficient here to say that it is my

opinion the plaintiff has been guilty of a misuse of its patents; that it is, therefore, without clean hands in this court; that this situation has not been purged; and that the instant proceeding must be dismissed.

In accordance therewith, I make the following findings of fact and conclusions of law:

### Findings of Fact

1. On July 1, 1934, plaintiff entered into certain agreements with Square D Company of Detroit, Michigan, and Cutler-Hammer, Inc., of Milwaukee, Wisconsin, wherein plaintiff granted non-exclusive and non-divisible licenses, involving patents in suit, to said companies under patents of plaintiff to make and sell the AB type of circuit breaker. Each of said licensees was obliged to pay a 5% royalty to plaintiff. The license grants were conditioned on the said licensees selling the AB type circuit breakers at prices no more favorable to customers than those established and followed by plaintiff in making its sales.

Said sales price condition of the grant has continued to be and now is in effect.

In such license agreements, Square D Company and Cutler-Hammer, Inc., agreed not to assert against plaintiff any of their patents; and Westinghouse agreed to be bound to the price schedules published by it for minimum thirty-day periods.

2. After the development of the Multibreaker type circuit breaker, plaintiff, by agreement with Square D Company dated July 1, 1936, and by agreement with Cutler-Hammer, Inc., dated October 1, 1936, amended its said agreements dated July 1, 1934, with said Square D Company and Cutler-Hammer, Inc., to include the said Multibreaker in the license grant. Said agreements were further amended to include a new Schedule C of patents, including patents in suit, which were not listed in said original agreements for said AB breakers.

The said amending agreements of July 1, 1936, and October 1, 1936, respectively, inserted an additional price control provision making the grant for the Multibreakers conditional on the licensees selling Multibreakers at prices no more favorable to the customers than those followed by plaintiff.

By letter dated April 9, 1948, plaintiff irrevocably waived said selling price control provision of the licensees applying to Multibreakers and withdrew and cancelled every price schedule applying to Multibreakers.

No such letters were sent out as to the price control provisions of the AB agreements, these remaining in effect, nor has plaintiff cancelled its right to fix prices charged by Frank Adam Electric Co., in its sale of its breakers.

The said 1936 amendments did not change the above 1934 agreements in any way as to the AB devices, but merely expanded the agreements to cover the Multibreakers and additional patents of Westinghouse. These price control provisions provided that plaintiff would not change its prices for Multibreakers without first giving the licensees thirty days notice.

The non-assertion clauses from Square D Company and Cutler-Hammer, Inc., in favor of plaintiff apply to the Multibreakers as well as to the AB breakers.

As to Multibreakers, the royalty rate to Square D Company was only 2½%, but as to AB breakers, the royalty rate to Square D Company remained 5%. The Cutler-Hammer, Inc., royalty, as to AB breakers, and Multibreakers as well, was 5%.

3. That on July 1, 1936, a license agreement was entered into between said Square D Company and plaintiff, whereby plaintiff was granted a non-exclusive and non-divisible license to manufacture, use and sell Multibreakers under inventions of certain applications for patents of licensor, Square D Company, which were later filed and subservient to the dominant patents of plaintiff covering Multibreakers. Said license is still in effect. Under said license plaintiff was obligated to pay to the licensor, Square D Company, a 2½% royalty for devices made and sold by plaintiff embodying inventions, the subject of applications for patents identified in said license.

It was also agreed that if licensor, Square D Company, should in the future grant a non-assertion under certain of its

patents to any licensee of plaintiff for the manufacture, use and sale of Multibreakers, plaintiff would pay to Square D Company 40% of the royalty received by plaintiff from such Multibreaker licensees as have been granted the non-assertion.

4. Plaintiff issued Multibreaker licenses to Cutler-Hammer, Inc.; to Trumbull Electric Mfg. Co.; to Colt's Patent Fire Arms Mfg. Company (now Federal Electric Company); and Arrow-Hart & Hegeman Electric Co.

Substantially simultaneously, Square D Company issued non-assertions to these same companies, and in accordance with said Agreement of July 1, 1936, a copy of each non-assertion from Square D Company to each of plaintiff's Multibreaker licensees was sent by Square D Company to plaintiff.

Royalties received by plaintiff for Multibreakers have been divided with Square D Company in accordance with the provisions of said agreement of July 1, 1936.

Multibreaker licenses have been issued by plaintiff only to those having such non-assertion agreements from Square D Company, and non-assertions have been issued by Square D Company only to those having Multibreaker licenses from plaintiff. Each such non-assertion from Square D Company to a Multibreaker licensee of plaintiff referred to the corresponding Multibreaker license from plaintiff and was limited to the period during which the corresponding Multibreaker license from plaintiff was effective.

The Colt's Patent Fire Arms Mfg. Company license from plaintiff for Multibreakers further provided that Colt's Patent Fire Arms Mfg. Company would not assert its patents against plaintiff or the plaintiff's licensees for Multibreakers. The Colt's license from plaintiff was transferred to Federal on July 1, 1944, and the Square D Company non-assertion to Federal of March 21, 1946, in recognition of that fact, was retroactive to the date of that transfer, July 1, 1944.

The plaintiff's licenses for Multibreakers were limited to designs manufactured by plaintiff or Square D Company, a limitation abandoned October 1, 1942.

Patents in suit are included in each of plaintiff's Multibreaker licenses.

From time to time after the grant of the said licenses plaintiff furnished schedules of its prices to its licensees, as provided for in the price control provision in each of plaintiff's licenses. These schedules of prices were followed by all the licensees.

The aforesaid Multibreaker licenses issued by plaintiff and the non-assertion letters given by Square D Company remain in effect, except as herein otherwise indicated.

5. Such licenses of paragraph 4' above were on the same terms as those contained in the license as to Multibreakers given to Cutler-Hammer, Inc., as set forth in the foregoing finding numbered "2".

The Multibreaker is manufactured and sold by plaintiff and by Square D Company and by the four licensees under the subservient patents of Square D Company and patents of plaintiff, and are referred to in the Multibreaker licenses of plaintiff as "Latching Contact Bar Type Circuit Breakers." The various dominant patent claims of plaintiff relating to Multibreakers were involved in Patent Office priority interference contests resulting in the dominant patents issuing to plaintiff as a result of concessions of priority from Square D Company to plaintiff.

6. Plaintiff granted a license, dated January 2, 1947, under certain of its patents involved in this suit, to the Frank Adam Electric Co., for the manufacture and sale of the commercial Frank Adam "Type AC" and "Thermag" circuit breakers, but plaintiff did not issue any price schedules for such breakers.

7. In May, 1944, plaintiff demanded price maintenance by Bulldog as a condition of any license from plaintiff to Bulldog, and no indication of a withdrawal of such demand was given by plaintiff to Bulldog until July 1, 1948, at a hearing before the Court, upon question addressed to plaintiff by the Court.

## Conclusions of Law

1. Plaintiff's price control program, as to AB and Multibreaker circuit

breakers, constitutes combination in restraint of trade.

2. The aforesaid combination in restraint of trade involves the patents in suit.

3. The aforesaid combination in restraint of trade constitutes a misuse of the patents in suit.

4. Plaintiff has made no showing of the termination or any modification of that part of the combination which relates to the control of the prices of AB circuit breakers.

5. Plaintiff has not shown the abandonment and full dissipation of that part of the combination which relates to the control of the prices of Multibreakers.

6. Plaintiff has not shown complete abandonment of misuse of the patents in suit or full dissipation of the consequences of that misuse.

7. Defendant's Motion for Summary Judgment dismissing the complaint shall be granted by suitable order of this Court.

Counsel are requested to attempt to agree upon such order. If such agreement can not be reached, each side is directed to submit a proposed order.