112 F.Supp. 676 (1953)
RONSON PATENTS CORP. et al.
v.
SPARKLETS DEVICES, Inc. et al.
No. 7923(2).
United States District Court E. D. Missouri, E. D.
May 25, 1953.
*677 *678 John H. Sutherland, of St. Louis, Mo., for plaintiff and additional party to the counterclaim.
Kingsland, Rogers & Ezell, and Edmund C. Rogers, of St. Louis, Mo., for defendant and intervenor.
HULEN, District Judge.
Ronson Patents Corporation[1] sued defendant Sparklets Devices, Inc.[2] for patent infringement by manufacture and sale of an automatic cigarette lighter. Ronson Art Metal Works, Inc.[3] was brought into the case on motion of defendant as a party plaintiff on defendant's counterclaim. Brown & Bigelow intervened as a party defendant. Defendants denied infringement and countered with a claim for $1,500,000 damages, charging plaintiffs with illegal monopoly and conspiracy in the production and sale of automatic cigarette lighters, to defendants' damage, in violation of the Sherman Act, 15 U.S.C.A. §§ 1-4; Wilson Act, 15 U.S.C.A. §§ 8, 9; Clayton Act, 15 U.S.C.A. §§ 13, 14. The charge of infringement was separated for hearing. It has been finally decided against plaintiffs, 8 Cir., 202 F.2d 87. The record has been completed on the issue made by the counterclaim. It is now for ruling.
I. Positions and Claims of Parties Defendants claim:
"In the present case * * * there exist contracts, combinations, and conspiracies in restraint of trade, condemned under Section 1 of the Sherman Act. These all involve more than one actor. Additionally there exist a monopoly and attempt to monopolize condemned under Section 2. * * * Also there exist here a combination or conspiracy to monopolize part of the trade of cigaret lighters condemned under Section 2, and this, of course, requires more than one person."
Plaintiffs deny: (1) all the defendants charges; (2) defendants have suffered damage from any act of plaintiffs.
In Kobe, Inc., v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, 422, the Court gave a generally accepted interpretation of the Sherman Act:
"Sec. 1 of the Anti-Trust Act declares that every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations, is declared to be illegal. Sec. 2 provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be guilty of a misdemeanor * * *."
To establish the charges made against plaintiffs, defendants rely on a chain of events, namely:
As of May, 1951, Art Metal was the primary producer of automatic cigarette lighters in the United States; Art Metal on May 8, 1951, made a final payment to their attorneys in connection with Congressional action extending the patent under which they manufacture automatic cigarette lighters; on May 5, 1951, Ronson sued intervenor Brown & Bigelow for patent infringement in St. Paul, Minnesota, the home of Brown & Bigelow; on May 6, 1951, Ronson published in a New York newspaper an advertisement announcing a butane cigarette lighter with a throw-away cartridge, but Ronson's lighter was not ready for sale "until a year and a half later"; on May 7, 1951, Ronson filed this suit, substantially identical with the suit in St. Paul; on May 4th Ronson notified one of defendants' largest customers (Bennett Bros. in New York) that sale of defendants' *679 automatic butane lighter was an infringement upon plaintiffs' patent; in June, 1951, Ronson published an ad setting forth an aggressive policy against patent infringers; defendant got a patent on its throw-away cartridge automatic butane lighter in July of 1951 known as the Felt patent; in the late Fall of 1951 Art Metal secured a patent on a butane throw-away cartridge automatic lighter known as the Flamm patent; plaintiffs sued Brown & Bigelow in New York for declaratory judgment that (1) the Felt patent is invalid, (2) not infringed by the Flamm patent, and (3) the Felt patent infringes the Flamm patent.
Defendants charge an intent on the part of plaintiffs to suppress the sale of butane automatic lighters by the conduct listed and to avoid the effect their success would have on plaintiffs' monopoly of wick liquid fuel lighters. Defendants present the same factual charges to support their argument that plaintiffs intend to extend their monopoly of automatic wick liquid fuel lighters over to cover automatic butane lighters.
Defendants also assert that plaintiffs illegally created a monopoly and were part of a conspiracy to monopolize and that plaintiffs' acts thereafter to further the monopoly are acts which are possible because the monopoly exists and are illegal and that such subsequent acts are themselves intentionally monopolistic. To support this position defendants present the following particulars against plaintiffs: an agreement between Ronson and Evans by which Ronson imposed price control on Evans; Ronson and Evans "fair traded" under the agreements; the Ronson-Evans agreements restricted certain officers of Evans entering into a competitive business; the Ronson-Evans agreements called for a royalty on all lighters manufactured by Evans regardless of whether they come under the Ronson patents or not; the Ronson-Evans agreements provided for cross-licensing.
As background evidence of plantiffs' intent to engage in and form a monopoly both individually and by conspiracy, and that plaintiffs did create an illegal monopoly defendants state: Ronson and Evans conspired to secure Congressional action to extend reissue Patent 19023, and among other things misrepresented the factual situation to Congress; Ronson had an aggressive policy of protection of its patent interest by suits and notice of infringement; Ronson acquired a large number of patents; Ronson was active in securing Treasury Department orders excluding foreign lighters from importation into this country; Ronson contracted with Japanese manufacturers not to ship automatic cigarette lighters into this country; Ronson's license contract provided for an increasing royalty scale as the sale of products increased; Ronson, not being a manufacturer, cannot enter into price-fixing contracts.
To support the prayer for $1,500,000 defendants claim damages: (a) cost of the patent litigation, including the New York suit still pending for trial; and (b) lost sales of table model lighters. By their brief defendants abandon any claim of loss of business on sale of pocket lighters. They sold all they could make, production having been curtailed by metal priority of the Government.

II. Facts
Plaintiff Ronson is a subsidiary of Art Metal. It was formed in 1946 and holds patents assigned to it by Art Metal, under some of which Art Metal manufactures lighters. Ronson does not manufacture. Art Metal has been manufacturing various articles for over forty years and cigar lighters since 1910, and automatic wick cigar or cigarette lighters for over twenty-five years. About 1928 it acquired the Aronson patent. Its business, growth, and success, using the Aronson patent, and the utility of an automatic lighter made under the Aronson patent, was commented on in a case decided by the Court of Appeals for the Second Circuit:
"Devices which have been marketed by the complainant [Art Metal] under the patent have had a large commercial success. While this success has been substantially promoted by advertising, there is little doubt that the patentee has devised a lighter that excels in compactness and convenience and has made valuable and meritorious contribution to an old art."
*680 Mr. Harris, President of Art Metal, testified that sale of the automatic lighter was such that it "took a commanding place" in the sales "practically instantaneously." At first there was no need for advertising. Manufacture of other items by the factory was discontinued to make the automatic lighters. Sales of automatic lighters from July 1927 to the end of 1927 amounted to $100,000 for 230,000 pieces; for 1928 sales were $2,335,000 for 830,000 pieces. Thereafter there was a gradual growth through the years. By the time of trial of the patent infringement feature of this case, Ronson was a leading manufacturer of automatic cigarette lighters. Lighters involved in this case are of two models, table and pocket. Seventy-five percent of plaintiffs' business is in the pocket lighter model. Including the two models, Art Metal now makes more automatic lighters than any other manufacturer.
The industry is a crowded one. Defendants listed eighteen patents as prior art in the defense to the patent infringement suit. There are many makes and kinds of lighters now on the market. We name some: A. S. R., Zippo, Elgin, Flaminaire, Stratoflame, Evans, Rogers, Marathon. Japan is exporting lighters. France, England and Canada are doing the same thing. All lighters are competitive with one another before the user. There are many kinds of butane lighters.
Defendant Sparklets is a manufacturer of the fuel cartridge for the lighter sold under its patent. Brown and Bigelow manufacture the lighter. Defendants started taking orders in 1950 for their automatic butane pocket lighter. The table model came later. The defendants divide their business. Sparklets has exclusive sales rights for the "re-sale field", and Brown & Bigelow sell direct to parties who want to distribute to consumers as an advertising medium.
Sales resistance met by defendants in introducing the new lighter was described by defendants' New York representative, Ruth Weissblum:
"I realized the distributor salesmen have so many items to sell that they couldn't concentrate or help introduce a new item successfully; so I took it upon myself to call on what I thought were the fine shops in New York to get them interested in our lighterwhich I was able to do.
"Q. Would you say whether or not, in the lighter field, Ronson, from your experience, has the best type of distributors that is, the best houses as their distributors? A. Yes.
"Q. Will you tell me whether or not you were able to sell your lighters to those same distributors? A. Not very successfully."
Questioned as to plaintiffs' automatic lighter being competitive, the witness said:
"A. No; I would say it was not competition. I might add to that, other than the name of Ronson. * * *
"A. We were new-comers coming into the field, introducing a butane lighter with a throw-away cartridge; and Ronson was a well-established firm * * *."
Later, cross-examined by defendants' attorney, the witness said:
"A. They [Ronson] are selling a complete line of lighters, giving the consumer an opportunity to see both the fluid lighter and a butane lighter. It's a complete line.
"Q. So that, would you or would you not say that you are selling against the whole Ronson line? * * * A. I would answer yes to that."
Defendants' butane or gas lighter has not been completely satisfactory with the trade. Miss Weissblum admitted they initially gave trouble. There was complaint that the valve leaked, that cartridges did not last, and one dealer said "they still have bugs in them." There was objection also that the price was too high, the lighter too heavy, and a possibility that they infringed "some patent."
The amounts and size of defendants' sales for butane lighters were: 1950197,114 pieces, selling price $2,108,239.20; 1951 131,113 pieces, selling price $1,424,373.02; 195280,628 pieces, selling price $759,643.68.
*681 Plaintiffs have pursued a policy of vigilance against Aronson patent infringers. During the approximately twenty-five year period it has been in production, Art Metal has brought 27 suits for infringement of the Aronson patent and given 36 notices of patent infringement that did not result in suit. Of the 27 suits, 8 were against manufacturers. This represents an average of about one suit filed each year, and between one and two notices of infringement for each year. Except for the Evans litigation we have no history of any of the cases or notices.
One of Art Metal's early suits was against an Evans dealer on a lighter made by Evans. In this suit the Evans lighter was held to infringe the Aronson patent. Art Metal Works v. Abraham & Straus, Inc., 2 Cir., 61 F.2d 122. A rehearing was granted in this case December 1, 1932, 62 F.2d 79. The first opinion was rendered in August prior. In seeking a rehearing, Evans raised a question of misuse by Art Metal of the opinion holding infringement by Evans. The District Court found in favor of Art Metal on the misuse issue. On appeal an opinion by Judge Manton, 70 F.2d 641, held the judgment of the lower court error and reversed, and a ruling was made that Art Metal had misused the first opinion. Art Metal was denied all relief sought. The date of this opinion is April 30, 1934. The last opinion was the result of the bribery of Judge Manton. On November 20, 1939 the Court of Appeals reversed Judge Manton's order and rendered a final judgment in favor of Art Metal, 107 F.2d 940. After Art Metal suffered Judge Manton's ruling, Art Metal and Evans entered into a licensing agreement. This was succeeded by an agreement in April, 1940, following the last opinion of the Court of Appeals, whereby Art Metal granted Evans a license to expire at the expiration date of the Aronson patent. In the agreement Evans was restricted to a ceiling price on lighters. On January 2, 1946 Congress by private Act extended the Aronson patent for the period covering the time between the Manton opinion and the opinion nullifying it. Art Metal then extended Evans' license for the period covered by the Act of Congress, but with modifications. Evans is a manufacturer of cigar lighters with much experience over a long period of time.
On May 5, 1951 Ronson sued Brown & Bigelow in St. Paul, Minnesota, home of Brown & Bigelow, for patent infringement. On May 7, 1951 Ronson sued Sparklets in St. Louis, being the patent issue of this suit. These two suits involved a charge that the named defendant had infringed the Aronson patent. After Ronson got its patent on a butane lighter in the fall of 1951 (the Flamm patent), it sued Brown & Bigelow in New York City charging defendants' butane lighter infringed the Flamm patent and sought a declaratory judgment on all phases of legality of the two butane lighter patents. Brown & Bigelow then raised the issue in the Minnesota case, charging the Flamm patent infringed its butane patent. The District Court in New York issued an order against Brown & Bigelow restraining the prosecution of the latter action by Brown & Bigelow in Minnesota. Defendants did not inject the butane lighter patents into this case.
There are other acts of the plaintiffs, through the years, presented by the defendants to sustain their charges. Ronson published an ad in a New York paper setting forth their policy to enforce their patent monopoly by proceedings against all infringers. They sent a letter, through their attorney, to Bennett Bros. in New York on May 4, 1951, claiming defendants' lighter infringed the Aronson patent. Bennett Bros. was one of defendant Sparklets' customers. On May 6, 1951 Ronson advertised for the first time a butane lighter with a throw-away cartridge. The ad set forth the lighter would soon be on the market and recommended that the trade wait for it. It was several months thereafter before a butane lighter with a throw-away cartridge was offered to the trade by plaintiffs, due to mechanical trouble that developed in the early model. Ronson secured a large number of patents. Ronson was instrumental in getting orders from the Treasury Department, under tariff laws that resulted in barring from importation certain foreign lighters. Ronson made a contract with a *682 manufacturer of lighters in Japan that the product of the Japanese plant would not be exported to this country.
All objections of plaintiffs and defendants to testimony and exhibits offered, not heretofore ruled on, are now overruled.

III. Conclusions
Have plaintiffs used a monopolistic advantage to suppress the competition of defendants in sale of their butane lighter? If they have, the monopoly is illegal, regardless of whether plaintiffs obtained their monopoly legally or illegally. Section 2 of the Act is aimed at the acquisition or retention of effective market control. The existence of power to exclude competition when it is desired to do so is itself a violation of Section 2, provided it is coupled with the purpose or intention to exercise the power. It follows that the use of monopoly power, however lawfully acquired, to foreclose competition in order to gain a competitive advantage or to destroy a competitor is unlawful. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.
It was recognized by court decree early in the history of Aronson patent litigation, that Art Metal had a superior product in its automatic lighter and that it appealed to the public. Art Metal exploited the lighter made under the Aronson patent by advertising. It was also zealous in guarding its legal rights as owner of the Aronson patent. This is apparent in the Evans litigation. Unquestionably much of the success of Art Metal in sale of the Aronson lighter flowed from the merits of the product, able and aggressive business management, and lawful use of the monopoly granted by the patent laws.
The Court cannot speculate that at some point in their history plaintiffs went beyond their lawful rights and engaged in practices and acts, and used their patent and the product made under it, to restrain trade, either individually or by combination, or to monopolize the lighter business. Plaintiffs' business has "grown through the years." But this is no basis for such an inference. Defendants have the burden to establish the course of conduct charged by substantial evidence.
Defendants rely heavily on circumstantial evidence. Our Court of Appeals has said of this type of evidence, in an antitrust case:
"`Inferences must be based upon proven facts or facts of which judicial notice must be taken and one inference cannot be based upon another inference. To sustain a finding of fact the circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion. Circumstantial evidence, even in a civil case, is not sufficient to establish a conclusion where the circumstances are merely consistent with such conclusion or where they give equal support to inconsistent conclusions.'" Pevely Dairy Co. v. United States, 8 Cir., 178 F.2d 363, 370.
Defendants' brief, not without invective terms, urges the proposition that Ronson enjoyed a monopoly in "wick automatic lighters," and that it was to protect this monopoly from the intrusion of defendants' butane lighter that plaintiffs "schemed" to restrain sale of defendants' lighters and to "monopolize butane lighters", to defendants' damage.
Plaintiffs submitted an interrogatory to defendants:
"Interrogatory No. 1.
"In respect to the allegations of Clause 24 of Defendant's Amended Counterclaim, (a) specify all acts of Plaintiff and of its alleged co-conspirators, upon which Defendant will rely at the trial to support the allegations of Clause 24 of the Counterclaim, * * *."
Clause 24 of counterclaim reads:
"Plaintiff has illegally monopolized, tended to monopolize and has conspired to monopolize, the business of automatic cigarette lighters in the United States and in and affecting interstate commerce therein, and through the world, to the damage of this defendant *683 and to the damage of the public in the United States."
Defendants answered:
"(a) The acts of plaintiff and its alleged co-conspirators (additional to the fact of monopoly of lighters, and of automatic lighters, and of lighters selling above about $3.00), * * *."
Much of the testimony bears on competition between the butane lighter of Ronson and defendants. It required an effort by defendants' counsel to get witnesses connected with defendants' sales force to bring their testimony within the present limited charge of competition of defendants' butane lighter with plaintiffs' "wick type automatic lighters." The Court had difficulty in reconciling some of the testimony and this claim.
"The Court: Counsel asked you a while ago what your principal competitor was. I take it your only competitor is Ronson, is that right? The Witness: Primarily that is true.
"The Court: That is, there are just two of you on the market with an automatic butane lighter with a throw-away cartridge? The Witness: That is right, sir.
"The Court: Practically, then, you are each competing for the market? The Witness: That is true in that field of lighter.
"The Court: Against each other. So far as you know you have no other serious competition? The Witness: That is true.
"The Court: Do you consider these other automatic lighters non-butane lighters are competition to your lighters? The Witness: Non-butane lighters?
"The Court: Yes. The Witness: No, sir, we do not consider that competition.
"The Court: You don't? The Witness: No, sir.
"The Court: In what way do you not consider them competition? The Witness: Well, we are actually merchandising a new way of lighting a cigarette.
"The Court: Are you paying any attention to the sales of that other type of lighter? Are you interested in them? The Witness: Not particularly, no, sir.
"The Court: Not particularly interested in them? The Witness: We follow their distribution pattern, that is all, where they sell lighters, per se.
"The Court: What do you mean? The Witness: The areas of the country wherein they sell the most lighters, just as a category of merchandise.
"The Court: Where they sell the most lighters there is probably a field for your lighters? The Witness: That is right.
"The Court: Supposing one company had all the business for every single automatic lighter, non-butane lighter, controlled all the business; would that make any difference to you? The Witness: This theoretical company does not have a butane lighter?
"The Court: That's right. The Witness: That wouldn't concern us too greatly, because we feel we are offering a different product.
"The Court: I don't get your theory there. You're talking about automatic lighters back in 1920, and this man that sells lighters says he isn't interested in them.
"Mr. Rogers: Actually we find at the retail level that they are actually in competition with all lighters of the automatic type.
"The Court: That isn't what he says. I asked him that. He said he wouldn't be interested; he said if here was a company that met your charge, exactly as has been made against this plaintiff, and went beyond them and monopolized a hundred per cent of non-butane lighters, it wouldn't interest him in the slightest. How can that kind of a monopoly
"Mr. Rogers: I frankly admit I'm taken a little bit by surprise at this point."
*684 The above testimony came from Mr. Arlen. He was sales manager for Sparklets in the sale of defendants' butane lighter. His job was to promote the sale of defendants' butane lighter. We cannot pass this testimony indifferently. And for this reason, if plaintiffs are the evil geniuses pictured by defendants and engaged unlawfully in suppressing defendants' business in sale of butane lighters, to defendants' damage, to protect sales of plaintiffs' "wick" lighters, it should not require the mental resources of counsel versed in patent law to recognize the situation. Surely the man responsible for putting defendants' butane lighter on the market should be plainly and fully aware of the sinister plot charged and its details as it affects defendants' sales. After all, if defendants' sales are not affected, defendants have no case.
The following day Mr. Arlen testified as follows:
"Q. (By Mr. Rogers) Yesterday you were asked by the Court I believe a question about the competitive situation, if there were a lone or single manufacturer in the whole country who was selling automatic lighters fueled by liquid fuel. My recollection is that you answered that that would not be competitive with your butane lighter.
* * * * * *
"Q. (By Mr. Rogers) I believe there was some testimony to that extent. Now, with the same hypothesis, that there be a single manufacturer in the whole country as the only one manufacturing automatic lighters fueled by liquid fuel, suppose that manufacturer
* * * * * *
"Q. then went into the business of butane lighters to the extent that he offered a butane lighter for sale, what would be the effect of that on your sales of your butane lighter? * * * The Witness: If I understand the question correctly, it is if a single manufacturer of fluid lighters dominated the entire market and if that company brought out a butane lighter, would that be competition. Was that the question?
"Q. Well, that is the first question. Would that be competition? A. That would be the most powerful competition I could contemplate."
Defendants' New York sales representative, Ruth Weissblum, seemed to be laboring under the same "delusion" as Mr. Arlen:
"A. * * * The only competition that I have, since I have been selling a butane lighter, is a similar productnot a regular filled lighter, such as you would callI don't know what the term isof a fluid lighter.
"Q. Would you say that butane lighters are not competitive with lighters fueled by ordinary fuels? A. I don't think they are, sir.
"Q. In other words, you would consider butane lighters competitive only with other lighters fueled by Butane or similar gas? A. Yes, sir."
The evidence convinces the Court that all lighters are in competition with each other in the consumer trade. A consumer is interested in purchasing a lighter. Butane, or any other method of supplying light fuel, is secondary. The primary position of two of defendants' witnesses, one its sales manager and the other its sales manager in the largest sales area in the United States, throws light on the extent of plaintiffs' activities here complained of, as they affected defendants' sales. That defendants now claim only the loss of sale of some 17,000 desk lighters, and admit they sold all the pocket lighters they could make, could represent the reason why defendants' sales forces readily fail to recognize what this case involves.
Is there free and open competition then among different kinds and makes of lighters, including those made by plaintiffs and defendants? Birch Vermillion, defendants' former sales manager, testified:
"Q. 29. Now, what lighters did you meet in competition when this table lighter, Exhibit S [defendants' lighter] came on the market in a general way? *685 A. Well, we all know the lighters that are in the field.
"Q. 30. Namely? A. We have Ronson, you have ASR, you have Zippo, you have Elgin, you have Flaminaire, you have a dozen, or a hundred cats and dogs in another hundred brands."
Defendants offered the deposition of Alfred F. Reilly. He is president of Evans Case Co. Defendants' brief describes "Evans" as a "bed fellow" of plaintiffs, but we get the impression from reading Reilly's deposition that "Evans" had no "love" for plaintiffs. He said in his deposition:
"Q. Insofar as these spin-wheel and snap-type lighters that are on the market, they are competitive with yours, are they not? A. Any lighter is competitive.
"Q. Likewise as to the butane-fueled lighters? A. That is correct."
Reilly minimized the competition of butane lighters:
"Q. From your experience, would you say that the butane-fueled lighters have made a substantial impress on the lighter market? A. To date any butane lighter that I am aware of was a total flop."
The testimony of dealers is entitled to serious consideration. They meet the consumer. The record contains the testimony of Mr. Oelsner of Rothenberg & Schoss Cigar Company of Kansas City. We quote:
"Q. What other lighters do you sell in the Rothenberg-Schoss Company? A. Quite a wide variety, including Debaugh (phonetic) Evans, Regens, Park German (phonetic). * * * A. We also sell Ronson.
"Q. In your experience with the handling of this variety of different brands of lighters, will you tell the Court whether your experience and observation have been that those lighters are competitive with each other, or not? A. My opinion is that all lighters are competitive with each other."
Mr. Moss of Moss and Lowenhaupt of St. Louis testified they carried "eight or ten different" kinds of lighters. This is a large distributor in the St. Louis trade section.
Although Ronson had more than a majority of the lighter business in the country in 1951, there is no substantial evidence that plaintiffs ever had, or at time of trial held, a monopoly in the cigar lighter field, other than what resulted from a superior product and aggressive, but legal, sales promotion. There were many lighters on the market. They all competed with each other. The evidence does not establish market control or power to establish market control in plaintiffs. Defendants cannot use the Sherman Act to effect what the product offered and legitimate sales effort has failed to accomplish or to stifle that which a superior product and legitimate sales effort has accomplished.
The prime circumstances relied on by defendants are the litigation with Evans, the contracts with Evans, and the extension of the Aronson patent by Act of Congress.
Defendants first entered the cigarette lighter market by soliciting orders in 1950. At all times they have confined their business to butane lighters, first a pocket model, and later a table model. Evans has been manufacturing lighters since 1911. Ronson sued Evans prior to 1931, charging infringement of the Aronson patent. At that time Evans was one of the leading manufacturers of lighters. We can find no basis for any charge of improper motive or act against Ronson in that litigation, as such. Ronson was asserting its lawful right of patent infringement and eventually the Court of Appeals vindicated it. Defendants urge in support of their charges, not particularly the litigation itself, but what flowed from it.
Defendants argue that the agreements made with Evans, after Congress had extended the Aronson patent, which fixed a ceiling on the price at which Evans could sell lighters under the license granted, are illegal "insofar as they tended to promote" plaintiffs' monopoly or create a monopoly. We are not informed how these agreements set up, help set up or promoted a monopoly or a "competition-suppressing *686 situation" as claimed by defendants. There is no substantial evidence that by the agreements Art Metal and Evans divided up the market, to any competitor's damage. Art Metal had a large market prior to the agreements by virtue of the character of its product and patent. Art Metal licensed Evans to manufacture and sell under its patent. This Art Metal had a legal right to do. As to plaintiffs' right to fix the selling price of the patented article under the license, we are bound by the General Electric case. United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.
The terms of patent licensing agreements between Evans and Art Metal prior to 1946 could not affect defendants. The 1946 license between Evans and plaintiffs does not present a situation where two or more competing concerns combine their patents under one control and exploit the combination of patents. By the agreement of 1946 between Evans and Art Metal, which is the only one in existence since defendants entered the field of cigarette lighter manufacture and sale, there was no cross-licensing of any of Evans' patents. This is not a closed pool case where outsiders were precluded from obtaining licenses such as in the Kobe case, 198 F.2d 423. Art Metal granted and offered licenses to many others to manufacture under the Aronson patent. The only effort made by Art Metal to fix prices by its licenses was on lighters made under the Aronson patent. Those prices Art Metal fixed, no one else. It was not the result of a conspiracy. Mr. Reilly of Evans said Evans had no voice in the fixing of the price field of its license.
Assuming, arguendo, that the Act of Congress four years prior to defendants entering business extending the Aronson patent could remotely affect defendants, there is no evidence in this case on which to found a conclusion that plaintiffs secured passage of the Act by misrepresentation to Congress or collusion with Evans. Evans was in no position to oppose it because of its guilt in securing the ruling against Art Metal. This Court cannot grapple with the subject of misrepresentation to Congress absent any record as to what was represented to Congress.
Defendants would draw inferences unfavorable to plaintiffs from the number of suits and notices of infringement brought and served by them. The counterclaim asserts plaintiffs made unreasonable infringement claims. The record is bare of details on these suits and claims, except for the Evans litigation. Defendants' theory seems to be that mere numbers should convict the plaintiffs. We are not informed what number of claims should be expected in the normal operation of a business like plaintiffs' over a period of twenty-five years. Was one suit a year an unreasonable effort to stop infringement efforts? Was from one to two notices a year improper? How can we draw any inference unless we know the merits of at least some of the cases? There should be some showing of at least one sham law suit. The Evans litigation cannot be classed as unreasonable litigation by Art Metal. Until we are enlightened on this claim defendants cannot substitute speculation for substantial evidence.
Defendants have failed to carry the burden of establishing unlawful monopoly. It follows that defendants' charge of "fair trading" is without substance. See 15 U.S. C.A. § 1, Miller-Tydings Act.[4]
If defendants are to prevail in this case, it must be on the theory that plaintiffs unlawfully abused their patent rights and such monopoly as they accorded in volume of business created by a superior product, skillfully and aggressively promoted, to suppress competition of defendants, to defendants' damage.
The wide range of evidence in a prosecution for violation of the Sherman Act, by the Government, does not apply *687 where the plaintiff is a private party suing for damage for injury sustained by alleged acts in violation of the Sherman Act. In Jack v. Armour & Co., 8 Cir., 291 F. 741, 745, it was ruled:
"The statute on which he relies provides, in substance, that any person who shall be injured in his business or property by reason of the doing by any other person or corporation of the acts and things prohibited by other sections of the Sherman Anti-Trust Act may sue therefor and recover threefold damages for the injuries so sustained. * * *
"* * * The question whether the United States could sue upon such a showing as here made is not involved and is neither important nor decisive, and the cases cited by plaintiff are not in point. * * * On both reason and authority, no one can maintain an action under the provisions of section 7 of the Sherman Anti-Trust Act, unless he has suffered an injury in his business or property by proximate reason of the violation by the defendant or defendants whom he sues, of some of the prohibitions contained in that act; for this is what the act says in plain and simple language. It is needless to say that it has been so construed by the courts. * * *
"So far at least as concerns private persons, a mere conspiracy is not actionable, absent overt manifestations thereof, by which injury is inflicted upon the business or property of him who sues, or mayhap, in a proper case, upon his person."
The act of plaintiffs in offering a license to defendants before bringing suit is not in harmony with defendants' claim that plaintiffs' purpose was to suppress defendants' business rather than lawfully protect plaintiffs' patent. Defendants answer that the licenses offered by Ronson would not permit them to sell at all prices and the royalty was higher than offered to some other licensees. However this may be, the license offered provided for direct competition with Ronson, if not Evans.
The litigation instituted against defendants by plaintiffs is listed as acts to suppress the competition of defendants against plaintiffs' "wick lighter." After reading the briefs on this issue and studying the record we are constrained to feel that neither party to this case is "away from home" in any court. Defendants recite the location of the various suits and complain that "Ronson has with determination forced Brown & Bigelow away from its home for all litigation." When the New York Court had before it the question of enjoining defendants from proceeding with certain litigation filed by them "at home," no such harassment issued was raised.
"There is no charge that the plaintiff [Ronson] selected this forum to annoy, vex or harass the defendant or that a trial here will present any impediment to the defendant in the full and proper assertion of its claims." Ronson Art Metal Works v. Brown & Bigelow, D.C.S.D.N.Y., 105 F. Supp. 169, 173.
Rather the Court ascribes defendants' actions to other motives:
"This attempt to assert seniority is but one of a series of calculated moves by the defendant [Brown & Bigelow] to overcome plaintiff's priority position in this action." 105 F.Supp. 169, loc.cit. 173.
This suit was instituted on May 7th, 1951. It charged infringement of the Aronson patent. In July 1951 defendants obtained their butane lighter patent. Later the same year plaintiffs got a patent on a butane lighter. If defendants wanted to settle all their controversies with plaintiffs in one action (as they represented when they brought Art Metal into this case) we are at a loss to understand why they did not raise all issues in this suit. All of the parties are in this Court and in this case. Here defendants raised only an issue under the Sherman Act and "sought to inject all the issues of the New York suit into the parent case" in St. Paul, after the New York case was filed by Ronson. (See defendants' brief) Now the issue of infringement between the two butane lighters is in the pleading of both parties in the *688 New York case, filed last. Defendants are restrained from prosecuting the Minnesota litigation and we have the anti-trust issue here. Plaintiff filed a suit in St. Paul on May 5th against Brown & Bigelow and followed it with one in St. Louis on May 7th, 1951 against Sparklets substantially like the St. Paul pleading. Plaintiffs state that at the time of filing the suits against Sparklets they did not know Sparklets obtained their product, except the butane tank, from Brown & Bigelow, and they did not believe a judgment against one would bind the other. Be that as it may, when Brown & Bigelow sought to intervene in this suit, plaintiffs readily consented, thereby nullifying the St. Paul proceeding in so far as the complaint was concerned. They readily consented to Art Metal being made a party to this case under defendants' counterclaim. We find no bad faith by either party in their conduct in either of these suits. The record reflects the maneuvering of adroit counsel seeking any advantage the law accorded them in selecting a battleground to maintain what they believed to be the lawful rights of their clients. Defendants may speculate on the purposes of plaintiffs. This court cannot. Defendants' motives are not in issue.
Defendants assign as a further effort by plaintiffs to suppress competition the publication by plaintiffs in the New York papers on May 6, 1951 of an advertisement announcing a new Ronson butane lighter with a throw-away cartridge. This throw-away cartridge was a prime feature of defendants' lighter. This ad preceded actual sale of a lighter by plaintiffs with throw-away cartridge by several months, not a "year and a half". The exact lighter advertised never did appear on the market. Among other things objectional in the ad, defendants point out this language:
"If your dealer cannot yet supply you, he will have these new lighters shortly."
Defendants assert, "this advertisement was never intended to sell the non-existent Maximum Ronson * * * it was to suppress sales of defendants' lighters."
It is not unusual in the commercial world to advertise a new product ahead of its actual advent on the market. We see it daily in papers and magazines. One reason is to create a demand ready at the time of offering. There are other reasons. Defendants' counsel developed from Mr. Hirschorn, Vice President of Ronson, that:
"* * * the lighter that is illustrated in that ad was actually never delivered to the trade, because it developed after the lighter had been engineered, we ran into production difficulties. We found that we were not able to put out a lighter which could be marketed to the public, that would give the performance that Ronson reputation was based on, and we actually never made any sales of that particular model. We later made a change and sold another lighter which is now being marketed under * * *."
The reason for putting the ad in was stated:
"A. Well, it was my understanding it was primarily a test market campaign, it was a very limited ad, one newspaper and one market.
"The Court: I am not acquainted with the practices. What do you mean by a test market campaign? A. Well, just to get some reaction in a market area, to determine just what the acceptance or acceptability of the article is."
There is no evidence from which to infer this ad was published to suppress defendants' business. To so hold would require resort to speculation. Absent proof to the contrary, it does not impress us as reasonable that a firm with Ronson's standing in the trade, and with the "best" distributors handling the product, would resort to such a practice. We say this because pure selfish reasons on Ronson's part should preclude it. Ronson is managed by astute businessmen. They have built up a successful business. Ronson cannot abuse its trade by false promises and trickery and hold it. Their officers need not be very bright to appreciate this. If Ronson's purpose was to harm defendants, the act would have *689 harmed plaintiffs more when the truth was known. Ronson did come out with a butane lighter with a throw-away cartridge, after they had overcome production problems. This gives weight to their claim that the ad was published in the pursuit of a legitimate business purpose.
Plaintiffs commenced delivery in October, 1951 of a butane lighter with a throw-away cartridge. Of course we are not trying defendants, but we do not understand defendants to admit any improper action in their announcing a new lighter model in advance. But we are called on to infer such from similar action by plaintiffs.
On this assignment it should not be overlooked that defendants used advance notices of their lighter. As early as October 6th, 1950, they gave announcements to their salesmen of a coming new product. The first shipment of the new product was made November 28, 1950. The haste of defendants to get their lighter on the market may have injured defendants' business chances with prospective customers. Troubles arose in the trade (see testimony of Mr. Moss) from parts and their functioning.
Defendants also complain of another ad run in a New York paper. The ad was run in June, 1951 and can be summed up as a declaration of Ronson's patent policy, namely:
"* * * to proceed vigorously against goods, either foreign or domestic, which we regard as infringing upon Ronson patents or competing unfairly with Ronson products."
We find nothing in this statement which Ronson was not authorized to do by law. Defendants infer the ad was directed at the drug trade, to intimidate them from purchasing defendants' product. The ad was not published in a trade journal. Defendants' product is not mentioned. Defendants' reply brief states there are many kinds of butane lighters. The ad makes no reference to butane lighters; it refers to all patent interference. There is just as much reason to assume it was intended to warn others as to warn defendants or their customers. There is no substantial evidence that a single customer of defendants' product ever read the ad or that defendants lost a single sale by it. Defendants admit they sold all the pocket lighters they were able to make under allotment of materials.
Prior to this ad plaintiffs had sent a letter to Bennett Bros. in New York, in which it was set forth that defendants' pocket lighter infringed the Aronson patent. There is no evidence any other customer of defendants received such a notice. The notice did not prevent Bennett Bros. handling defendants' lighter. There is no proof the notice was not given in good faith for the purposes set forth.
Defendants claim that the suits filed against them by plaintiffs (and other litigation) was a clever attempt to make "Ronson's aggression known to almost everyone in the United States." The ad and letters of the kind sent to Bennett Bros. are cataloged also as threats of the same character and for the same purpose, to frighten "off the retail customers." Some of defendants' representatives testified to lost customers, through "fear" of what Ronson "would do." This is pure hearsay and entitled to little if any weight unless corroborated by testimony of those who were alleged to have been frightened. Not one customer was called who confirmed the opinions of defendants' agents that he had been frightened or deterred from handling defendants' lighters because of any act of Ronson or Art Metal. Defendants argue it was plaintiffs' burden to produce negative testimony of lack of fear by the dealers. We know of no law on which a shift in the burden of proof in this case can be founded.
After the suits were filed it appears that defendants gave out news releases on the subject. We mention only one. Answer to interrogatory number 18 is as follows:
"(a) A publicity release was made July 31, 1951, by Brown & Bigelow, as per copy attached hereto. This went to the New York World Telegram & Sun, and to the New York Herald Tribune. Beyond this release, defendants supplied no statements in writing to either paper concerning this matter."
*690 A part of the news release read as follows:
"St. Paul, Minn.Lawsuits involving millions of dollars centering around the new compressed gas cigaret lighter introduced last year by Brown & Bigelow were on file in federal district court here today.
"Disclosure of the court battle involving the new type gas lighter came with filing of a $1,500,000 counter claim by the St. Paul advertising specialties firm against Ronson Patents, Inc. The latter firm is a New York subsidiary of Ronson Art Metal Works, Inc., manufacturer of Ronson cigaret lighters.
"In the counter suit, it is charged the lighter made by the local firm in no way infringes on the patent on the old style lighters held by Ronson. A design patent, No. 161,911, on the gas lighter was issued the local firm February 13, Brown & Bigelow officials said. In the original action begun in May, Ronson seeks to prevent manufacture of the gas lighter by Brown & Bigelow on grounds of patent infringement.
"The counter suit is based on charges the original patent of Ronson obtained in 1928 and reissued in 1933 and 1945, is invalid. The action states the patent obtained by Ronson covering the old style type of lighter involving use of a wick and snuffer, involved an idea that was not its exclusive right at the time."
Defendants urge that their conduct in giving publicity to this suit is immaterial. If there was evidence of loss of business resulting from publicity given suits filed by plaintiffs, it might be hard to separate who was responsible for which publicity, among the parties to this case.
There was no evidence offered of any news releases being issued by plaintiffs. Viewing the record as a whole the Court cannot find the documents and conduct of plaintiffs relied on by defendants was for the purpose of suppressing defendants' business or frightening the public or that it did so.
What was the effect on defendants' sales of these alleged acts of plaintiffs "against" defendants, chronologically arranged in the brief commencing on May 5, 1951 and ending in June, 1951? The acts were presented not only as evidence of promotion of monopoly in wick lighters by plaintiffs and to prevent injury to that monopoly by sale of butane lighters by defendants, but as showing how plaintiffs intimidated the retail dealer by fear of suits so they would not handle defendants' lighters. Defendants Exhibit 10-A shows defendants had their best sales record in 1951, and that sales jumped from $69,178.06 in May to $205,985.49 in June, reached a high for the year of $266,015.83 in September, 1951.
There are other matters injected into the case by defendants, such as the number of patents plaintiffs own. We are unable to find in either of these subjects grounds for complaint by defendants. Defendants could not have suffered injury by either of them.
In considering this evidence we have done so from the viewpoint of the individual act, and taking plaintiffs' record as a whole, for conduct can be legal under the anti-trust laws when examined as an isolated transaction, but as a part of a train of action it may be illegal. The only acts of plaintiffs which we find evidence a desire to limit competition relates to foreign competition. Plaintiffs did take part in securing the issuance of some treasury orders. These did prevent lighters from being imported to compete with lighters made in this country. There is no evidence that these acts were part of any general scheme. They remain isolated acts of the plaintiffs. Instead of injuring other domestic manufacturers, and tending to create a monopoly in plaintiffs, we are impressed it would have the opposite effect. It kept out some foreign competition and left the weaker manufacturers in this country without that competition, which doubtless they were less able to meet than plaintiffs. There could have been no damage to defendants by any of these orders. The same conclusions apply to plaintiffs' efforts to keep out Japanese imports.
*691 We find no substantial evidence, direct or circumstantial, of any conduct proscribed by law, singly or collectively, by plaintiffs or plaintiffs and others, tending or intended to effect a monopoly in the automatic cigarette lighter trade, or to suppress defendants' sales, for protection of the automatic lighter business of plaintiffs or for any other unlawful purpose.

IV. Damages
Although we find defendants have failed to carry the burden of proof on the merits of the case, we will rule on the damage claim. Defendants claim damage of two types: Loss of sales of lighters and cost of patent litigation. Defendants admit there was no loss in sales of pocket lighters, because war restrictions on metal prevented Brown & Bigelow "from manufacturing all of the pocket lighters it might have sold." It would appear that the same restrictions would apply to the desk lighters. Defendants claim loss of sales on 17,529 desk lighters, at a profit of $21,996.79, due to plaintiffs' "monopolistic practices."
The rule of law on damages is not a matter of dispute. Defendants must prove a pecuniary loss to its business; it must be proven by facts from which their existence is logically and legally inferable. Possibility or conjecture as to the casual connection between the wrong and the injury is insufficient.
The cause of failure of defendants to sell the 17,529 desk lighters has not been traced to any act or acts of plaintiffs, lawful or unlawful, even by speculation.
At the very threshold of this case plaintiffs endeavored to secure from defendants the basis of its claim for damages, by interrogatories.
Interrogatory number 21 reads as follows:
"Will it be contended by the defendant on the trial that any dealer or customer solicited by the defendant has been caused (a) to refuse to purchase any article or product offered on the market by defendant, (b) discontinue purchase of any such article or product, (c) return any such article or product to defendantby any acts of any Art Metal employees going beyond normal and lawful efforts to sell Ronson goods; if the answers to any of (a)-(c) are in the affirmative (d) identify by name and address all dealers or customers involved, (e) defendant's articles or products involved (f) the names of the Art Metal employees involved (g) specifically describe and set forth the acts by which each of such employees will be alleged to have so caused such refusals, discontinuances or returns, and the times and places at which each of such acts allegedly occurred." (Emphasis supplied)
The answer was:
"(a) Yes.
"(b) Yes.
"(c) Yes.
"(d) Not known to defendants at present, but when known identity will be available to plaintiff.

"(e) Gas lighters, like Exhibits S, T, TT.

"(f) Not known to defendants, but when known identity will be available to plaintiff.
"(g) Not known to defendants, but when known identity will be available to plaintiff." (Emphasis supplied)
While defendants now say they sold all pocket lighters they could make, the answers make no such limitation.
Mr. Oelsner testified in this case:
"Q. Back in 1951, when you say you were solicited for ordering defendant's lightersand by defendant's, I mean Knapp-Monarch'sdid you at that time, or, rather, did Ronson at that time offer a desk or table lighter that was butane fueled? * * * A. I thing in 1952 Ronson came out with their first butane table lighter."
Apparently the desk lighters were not generally offered in competition with defendants until after the counterclaim in this suit was filed. Plaintiffs never at any time accused the desk lighter, in any way.
*692 Evidence in the record that could account for some loss of sales of butane desk lighters is: trouble with the lasting qualities of the gas cartridge (see testimony of Mr. Moss), "a very high price" (see testimony of Mr. Oelsner), trouble in making deliveries (see testimony of Mr. Heinrich), loss of appeal to the public (see testimony of Mr. Moss).
Even if there were proof of loss of sales, traceable to plaintiffs' acts here complained of, defendants' method of computing damage has no support in law. Defendants would take the measure of profits on its business as a whole and apply it to a new product, without any evidence of cost of manufacture, cost of sales (of a new product) or net income from sales. See Central Coal & Coke Co. v. Hartman, 8 Cir., 111 F. 96.
Had defendants sustained their claim on the merits, recovery of damages would have been restricted to proper attorneys' fees and costs of litigation, in this case.
Decree dismissing the counterclaim may be settled and submitted.
NOTES
[1] Herein referred to as Ronson.
[2] Herein referred to as Sparklets.
[3] Herein referred to as Art Metal.
[4] "* * * nothing contained in sections 1-7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, * * *."